Chad Pehrson (Bar No. 12622)
**KNH LLP**
50 W. Broadway, 9th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Email: cpehrson@knh.law

*Attorneys for Plaintiff*


# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


| | |
|---|---|
| ROXBERRY LICENSING, LLC, a Utah limited liability company,<br><br><br>        Plaintiff,<br><br>v.<br><br><br>ROXBERRY NATURALS, INC., an Ohio corporation,<br><br><br>        Defendant. | **MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Case No. 2:26-cv-00126<br>Judge: _____ |


Pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116, Plaintiff Roxberry Licensing, LLC

moves this Court to enter a preliminary injunction enjoining Defendant Roxberry Naturals, Inc.

("Defendant" or "Roxberry Naturals") from using the ROXBERRY mark or any confusingly

similar mark in connection with the advertising, marketing, distribution, or sale of any goods or

services.

## INTRODUCTION

Roxberry Juice Co. has been selling fruit-based beverages under the "Roxberry" name since 2008. Roxberry Naturals has been doing so since September 2024. Both are in the beverage business. Both use the identical word: "Roxberry." Both target health-conscious families. And both sell their products to the same consumers.

If that sounds confusing, it is.  That is precisely why this motion is necessary. Roxberry Juice Co. opened its first smoothie and juice bar in March 2008 in American Fork, Utah, and has since built a family-owned franchise network spanning Utah and Idaho over nearly two decades of continuous use, with past expansion to Virginia as well. (Compl. ¶¶ 12–16; Davis Decl. ¶¶ 4–8.) Plaintiff secured a federal trademark registration for its ROXBERRY JUICE CO. design mark, U.S. Registration No. 5,495,492, which has been active and in good standing since 2018. (Compl. ¶¶ 17–19; Davis Decl. ¶¶ 12–16.)

Defendant entered the market sixteen years later. In September 2024, Roxberry Naturals began selling carbonated "Roxberry Fizz for Kids" drinks under the identical ROXBERRY name. (Compl. ¶¶ 20–22; Davis Decl. ¶¶ 19–21.) Defendant did not stumble upon this name by accident. The USPTO itself refused to register Defendant's "ROXBERRY" word mark in May 2025, citing a likelihood of confusion with Plaintiff's existing registration. (Compl. ¶¶ 27–28; Davis Decl. ¶¶ 24–25.) Rather than heed that warning, Defendant let its application die—and then doubled down. By January 2026, Roxberry Naturals products had flooded more than 2,200 Walmart stores across all 50 states, along with 450 Kroger, 273 Meijer, and 262 Harris Teeter locations. (Compl. ¶¶ 31–32; Davis Decl. ¶ 28.) Defendant also appears prominently in search results for the term

"Roxberry," with search engines intermixing results for the two brands and effectively diverting consumers searching for Plaintiff to Defendant. (Compl. ¶ 34; Davis Decl. ¶ 30.)

Plaintiff sent Defendant a cease-and-desist letter. Defendant did not respond. (Compl. ¶ 35; Davis Decl. ¶¶ 31–32.) Instead, Defendant continued—and continues—its aggressive nationwide expansion under Plaintiff's name.

This is not a stale dispute. Plaintiff filed this action promptly after Defendant's conduct transformed from a limited regional product launch into a nationwide campaign. While Defendant's initial market entry in late 2024 involved limited distribution, its January 2026 expansion into more than 2,200 Walmart stores across all 50 states represented a qualitative change—a progressive encroachment that made the harm imminent, irreparable, and impossible to ignore. Plaintiff acted within weeks of learning of that expansion.

This Court should put a stop to it. This is a classic case of a well-funded junior user deliberately saturating the market with the senior user's exact mark, and doing so will full knowledge of Plaintiff's longstanding prior use.  Plaintiff satisfies each of the four requirements for preliminary injunctive relief: it is likely to succeed on the merits of its trademark infringement claims, it is suffering irreparable harm, the balance of equities tips decisively in its favor, and a preliminary injunction is in the public interest. The Court should grant this motion and order Defendant to cease all use of the ROXBERRY mark pending resolution of this action.

## FACTUAL BACKGROUND

Plaintiff incorporates by reference the allegations of its Complaint, which are verified under penalty of perjury by the Declaration of Brad Davis filed in support of this motion ("Davis Decl."). Mr. Davis, the Founder and President of Roxberry Juice Co., has personal knowledge of the facts underlying this dispute, and his declaration confirms that the factual allegations of the

KNH LLP | cpehrson@knh.law

Complaint are true and correct. (Davis Decl. ¶ 1.) The following summarizes the facts most relevant to this motion.

### A. Plaintiff's Establishment and Ownership of the ROXBERRY Mark

Brad Davis, an attorney-turned-entrepreneur, founded Roxberry Juice Co. in Utah in 2008. (Compl. ¶ 12; Davis Decl. ¶ 4.) Davis had previous experience with the juice business, including as a store owner and executive at Zuka Juice (which he helped grow to 108 stores in eight Western states and over $50 million in sales before its acquisition by Jamba Juice in 1999). (*Id.*) The first Roxberry Juice Co. corporate store opened in March 2008 at Hunter's Crossing Center in American Fork, Utah, establishing Plaintiff's first use of the ROXBERRY mark in commerce. (Compl. ¶ 13; Davis Decl. ¶ 5.)

Roxberry Juice Co. is a family-owned business. Davis's son, Braden Davis, is actively involved in the company's operations, and each franchise location is locally owned and operated. (Compl. ¶ 14; Davis Decl. ¶ 7.) The company expanded rapidly. The first franchised location opened in Murray, Utah in Fall 2008, followed by a Highland, Utah franchise in November 2008. (Compl. ¶ 15; Davis Decl. ¶ 6.) Since that time, Plaintiff and its franchise network have continuously used the ROXBERRY mark in connection with smoothies, fresh-pressed juices, açaí bowls, and related products across multiple states, winning multiple "Best of State" awards in Utah. (Compl. ¶ 16; Davis Decl. ¶¶ 8–10.) Through nearly two decades of continuous use, the ROXBERRY mark has acquired significant goodwill and consumer recognition in the health-conscious beverage market. (*Id.*)

Plaintiff owns a federal trademark registration for its ROXBERRY JUICE CO. design mark, U.S. Trademark Registration No. 5,495,492, Serial No. 87/470,335, registered on the Principal Register of the USPTO. (Compl. ¶ 17; Davis Decl. ¶ 12.) This registration provides prima

KNH LLP | cpehrson@knh.law

facie evidence of the mark's validity, Plaintiff's ownership, and Plaintiff's exclusive right to use the mark in commerce. *See* 15 U.S.C. § 1057(b). It also provides nationwide constructive notice of Plaintiff's claim of ownership. *See* 15 U.S.C. § 1072.

### B. Defendant's Adoption of the Identical Mark Sixteen Years Later

Roxberry Naturals was incorporated in Columbus, Ohio in 2022 by co-founders Andy Sauer, Lauren Sauer, and Dan Haugen. (Compl. ¶¶ 6–7; Davis Decl. ¶ 19.) Sauer is also the CEO of Garage Beer, a beverage company valued at approximately $200 million—demonstrating that Defendant's principals are sophisticated beverage-industry operators, not naïve newcomers who might have chosen the ROXBERRY name innocently. (Compl. ¶ 7; Davis Decl. ¶ 18.) The company raised $550,000 through a Form D 506(b) offering in September 2022. (Compl. ¶ 20; Davis Decl. ¶ 19.) Defendant sells "Roxberry Fizz for Kids"—carbonated canned beverages marketed as healthier alternatives to traditional sodas—in flavors including Galaxy Gulp Citrus, Ocean Potion Fruit Punch, and Pink Lava Strawberry Lemonade. (Compl. ¶ 21; Davis Decl. ¶ 19.)

Defendant's claimed first use in commerce of the ROXBERRY mark is September 23, 2024—more than sixteen years after Plaintiff's first use in March 2008. (Compl. ¶ 22; Davis Decl. ¶ 21.)

### C. The USPTO Found Likelihood of Confusion

On February 2, 2023, Defendant filed an intent-to-use trademark application for a Roxberry logo/design mark. (Compl. ¶ 24; Davis Decl. ¶ 22.) That design mark was registered on March 25, 2025. (*Id.*)

On November 20, 2024, Defendant separately filed U.S. Trademark Application Serial No. 98/863,067 seeking registration of the word mark "ROXBERRY." (Compl. ¶ 26; Davis Decl. ¶ 23.) On May 21, 2025, the USPTO examining attorney issued an Office Action refusing

KNH LLP | cpehrson@knh.law

registration of Defendant's word mark under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), based on a likelihood of confusion with Plaintiff's Registration No. 5,495,492. (Compl. ¶ 27; Davis Decl. ¶ 24.) The Office Action constitutes an independent governmental determination that the marks are confusingly similar for related goods.

Defendant failed to respond to the Office Action within the required six-month deadline, resulting in abandonment of the application on November 24, 2025. (Compl. ¶ 28; Davis Decl. ¶ 25.) This abandonment is critically significant: it demonstrates that Defendant had actual notice of Plaintiff's prior rights and yet chose to continue using the ROXBERRY mark rather than contest the USPTO's finding or rebrand. (Compl. ¶ 29; Davis Decl. ¶ 25.)

### D.  Defendant's Willful Nationwide Expansion Despite Notice

Rather than cease its infringing conduct after receiving the Office Action, Defendant dramatically accelerated its expansion. The timeline is stark: the USPTO refused registration on May 21, 2025; Defendant's word mark was abandoned on November 24, 2025; and less than two months later, by January 13, 2026, Defendant announced expansion into more than 2,200 Walmart stores across all 50 states, 450 Kroger locations, 273 Meijer locations, and 262 Harris Teeter locations. (Compl. ¶¶ 31–32; Davis Decl. ¶ 28.) Defendant's products are also available through Amazon and Defendant's own website at getroxberry.com. (Compl. ¶ 33; Davis Decl. ¶ 29.)

When consumers search for "Roxberry" online, Defendant's products appear prominently in search results—including ahead of Plaintiff—with search engines intermixing results for the two brands. (Compl. ¶ 34; Davis Decl. ¶ 30.) Even search engines intermix results for the two brands, demonstrating the marketplace confusion Defendant's conduct has already created. *(Id.)*

Plaintiff, through counsel, sent Defendant a cease-and-desist letter demanding that Defendant halt all use of the ROXBERRY mark. (Compl. ¶ 35; Davis Decl. ¶¶ 31–32.) Defendant failed to respond. *(Id.)*

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008)*; *see also Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276, 1281 (10th Cir. 2016)*.

The trademark laws specifically authorize the granting of injunctive relief. 15 U.S.C. § 1116(a). To obtain preliminary relief, a Lanham Act plaintiff "need not show" infringement—only that it is "likely to succeed" on the merits. *See Equitable Nat. Life Ins. Co. v. AXA Equitable Life Ins. Co., 434 F. Supp. 3d 1227, 1239 (D. Utah 2020)*.

Plaintiff satisfies each of these requirements and is therefore entitled to preliminary injunctive relief.

## ARGUMENT

The marks are identical in their dominant word element. Both parties use "ROXBERRY"—an invented, fanciful term that appears in no dictionary—to brand fruit-based beverages sold to health-conscious families. That fact alone drives the likelihood-of-confusion analysis. When combined with the United States government's own finding that the marks are confusingly similar, Defendant's deliberate expansion after that finding, and evidence of actual consumer confusion already in the marketplace, this case presents one of the strongest records for preliminary injunctive relief a trademark plaintiff can assemble. This case also presents classic

KNH LLP | cpehrson@knh.law

reverse confusion: a well-funded junior user with massive nationwide distribution is saturating the market under the senior user's mark, threatening to overwhelm and swamp the goodwill that the senior user has built over nearly two decades.

### I. Plaintiff Is Likely to Succeed on the Merits

A Lanham Act plaintiff demonstrates likelihood of success by showing (1) it has a protectable mark and (2) the defendant's use creates a likelihood of confusion. *Equitable Nat. Life, 434 F. Supp. 3d at 1239*. Plaintiff easily satisfies both elements.

### A. *Plaintiff Owns a Valid, Protectable Mark*

Plaintiff is the owner of U.S. Trademark Registration No. 5,495,492 for its ROXBERRY JUICE CO. design mark, registered on the Principal Register. (Compl. ¶ 17; Davis Decl. ¶ 12.) The Lanham Act creates a statutory presumption of protectability for registered marks: registration "shall be prima facie evidence of the validity of the registered mark, . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(a); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). Moreover, "[t]he owner of a mark on the principal register enjoys valuable benefits, including a presumption that the mark is valid." *United States Patent & Trademark Office v. Booking.com B.V.*, 591 U.S. 381, 386 (2020). Plaintiff is therefore likely to succeed in establishing that its mark is valid and that it owns it. *See Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1166–69 (D. Utah 2007).

### B. *Defendant's Use Creates a Likelihood of Confusion*

In the Tenth Circuit, courts examine six factors to determine likelihood of confusion: (1) the degree of similarity between the marks; (2) the strength of the plaintiff's mark; (3) the intent of the alleged infringer; (4) the similarity of goods, services, and marketing; (5) the degree of

KNH LLP | cpehrson@knh.law

purchaser care; and (6) evidence of actual confusion. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999); *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). "No one factor is dispositive," and "the importance of any particular factor in a specific case can depend on a variety of circumstances." *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1072 (10th Cir. 2023). Here, every factor favors Plaintiff.

### 1. *The Marks Are Identical*

"The similarity of the marks has always been considered a critical question in the likelihood-of-confusion analysis." *Hornady Mfg., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014) (describing similarity as the "most important factor"). Courts assess similarity by examining "appearance, pronunciation of words used, verbal translation of the pictures or designs involved, and suggestion," giving "greater weight to the similarities than to the differences." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986).

Here, the dominant element of both marks is the identical word: "ROXBERRY." The marks look the same, sound the same, and convey the same commercial impression. While the design elements surrounding the word differ, the dominant word component controls the confusion analysis. This is not a case of marks that are merely "similar"—the core word mark is identical in every respect. This factor weighs heavily in Plaintiff's favor.

The following side-by-side comparison illustrates the striking similarity between the parties' marks, products, and branding:



KNH LLP | cpehrson@knh.law

Defendant's mark is often used as a standalone "ROXBERRY" word mark on packaging, making it even more identical to the dominant element of Plaintiff's registered mark. On Defendant's cans and multipacks, the term "ROXBERRY" appears in large, prominent lettering as the primary brand identifier, with the descriptive phrases "FIZZ FOR KIDS" or flavor names positioned secondarily in smaller type. This use isolates and emphasizes the exact word that forms the commercial impression and dominant element of Plaintiff's federally registered ROXBERRY JUICE CO. design mark. In trademark law, the word portion of a composite mark is typically given controlling weight, particularly when the junior user deploys that identical word as a standalone identifier. *See Hornady Mfg., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986). This practice renders the marks virtually indistinguishable in commercial impression and strongly supports a finding of likelihood of confusion

### *2. Plaintiff's Mark Is Strong*

"The stronger the trademark, the more likely that encroachment upon it will lead to confusion." *Affliction Holdings, LLC v. Utah Vapor Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019). Mark strength is evaluated by both "conceptual strength" (placement on the distinctiveness spectrum) and "commercial strength" (marketplace recognition). *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1151–52 (10th Cir. 2013).

The ROXBERRY mark is conceptually strong. It is a coined, fanciful term—it does not appear in any dictionary and was created specifically to serve as a trademark. Fanciful marks occupy the highest rung of the distinctiveness spectrum. *See Elevate Fed. Credit Union*, 67 F.4th at 1074. Registration on the Principal Register without requiring a showing of secondary meaning further confirms the mark's inherent distinctiveness.

KNH LLP | cpehrson@knh.law

The mark is also commercially strong. Plaintiff has used the ROXBERRY mark continuously for nearly 18 years, holds a federal registration, operates a multi-state franchise network of more than 20 locations, and has received multiple state-level "Best of State" awards. These facts establish substantial marketplace recognition. *See Water Pik*, 726 F.3d at 1152 (considering "length and exclusivity of use" as evidence of commercial strength). This factor strongly favors Plaintiff.

### 3. *Defendant's Infringement Is Willful*

The third factor examines "[e]vidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident." *Hornady*, 746 F.3d at 1004. The Tenth Circuit has long held that "[o]ne who adopts a mark similar to another already established in the marketplace does so at his own peril because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983).

The evidence of willful infringement here is overwhelming. On May 21, 2025, the USPTO issued an Office Action refusing to register Defendant's "ROXBERRY" word mark based specifically on a likelihood of confusion with Plaintiff's registration. (Compl. ¶ 27; Davis Decl. ¶ 24.) That Office Action stands as proof that Defendant had actual notice of Plaintiff's prior rights. Yet rather than rebrand, Defendant abandoned its application and launched a massive nationwide expansion into thousands of retail stores. (Compl. ¶¶ 28–32; Davis Decl. ¶¶ 25, 27–28.)

Defendant's conduct after the Office Action constitutes classic willful infringement. "[C]ontinued use of the mark without explanation after notice amounted to a willful and deliberate infringement." *TakeCare Corp. v. TakeCare of Oklahoma, Inc.*, 889 F.2d 955, 956–57 (10th Cir. 1989). Defendant's failure to respond to Plaintiff's cease-and-desist letter further confirms bad faith.

*See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 937 (4th Cir. 1995) (expansion after demand to cease use supported "a presumption that [the defendant] acted in bad faith"). "Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion." *Sally Beauty*, 304 F.3d at 973. This factor weighs overwhelmingly in Plaintiff's favor.

### 4.  The Goods and Marketing Channels Are Closely Related

The fourth factor examines "(1) the similarity of products and (2) the similarity in how the products are marketed." *Equitable Nat. Life*, 434 F. Supp. 3d at 1250. Products "need not be identical"; "substantial similarity between products" suffices. *Id.* A "lower degree of similarity" between marks is required "when marks [are] placed on closely related goods." *Affliction Holdings*, 935 F.3d at 1114–15.

Both Plaintiff and Defendant sell fruit-based beverages to health-conscious families in grocery retail. Plaintiff sells smoothies, fresh-pressed juices, and açaí bowls; Defendant sells carbonated fruit-flavored drinks for children. Both are sold through overlapping and closely related retail channels—Defendant's products sit on Walmart, Kroger, Meijer, and Harris Teeter shelves, the same grocery stores where Plaintiff's franchise locations compete for the same consumers, and which represent Plaintiff's natural zone of expansion for packaged goods. Both market through the internet: Plaintiff through roxberryjuice.com and Defendant through getroxberry.com. (Compl. ¶¶ 21–23, 33–34; Davis Decl. ¶¶ 19–20, 28–30.) Indeed, the "possibility of confusion is greatest when products reach [the] public by [the] same retail outlets." *Beer Nuts*, 711 F.2d at 941.

That the goods overlap is underscored by the USPTO's own finding. The Office Action refused registration precisely because the examiner concluded that Plaintiff's and Defendant's

goods are sufficiently related that confusion is likely. (Compl. ¶ 27; Davis Decl. ¶ 24.) This factor strongly favors Plaintiff.

### 5. *Purchasers Exercise Little Care*

"Buyers typically exercise little care in the selection of inexpensive items purchased on impulse." *Beer Nuts*, 805 F.2d at 926. Defendant's products retail for approximately $4.89 for a four-pack of 7.5 oz cans—a quintessential low-cost impulse purchase. Plaintiff's smoothies and juices are similarly modestly priced. When consumers exercise little care in purchasing decisions, the risk of confusion increases substantially. This factor favors Plaintiff.

### 6. *Actual Confusion Is Not Required, but Evidence Supports It*

"[A] plaintiff need not set forth evidence of actual confusion to prevail in a trademark infringement action." *Elevate Fed. Credit Union*, 67 F.4th at 1082. This is especially true at the preliminary injunction stage. *See Trial Lawyers College v. Gerry Spence Trial Lawyers College at Thunderhead Ranch*, 23 F.4th 1262, 1273 (10th Cir. 2022) ("Even without actual confusion, the likelihood of confusion could contribute to a finding of irreparable injury.")

Here, there is already evidence of confusion. Plaintiff has received a consumer inquiry from a customer who complimented Plaintiff's "soda for kids"—demonstrating that consumers are already confusing Defendant's products with Plaintiff's brand. (Compl. ¶ 37; Davis Decl. ¶¶ 33–34, Ex. I.) Moreover, web search results intermix the two brands, with search engines unable to distinguish between them. (Compl. ¶ 34; Davis Decl. ¶ 30.) Furthermore, the confusion extends beyond ordinary consumers into the commercial marketplace: a NASCAR representative contacted one of Plaintiff's franchise partners to solicit a race-team sponsorship, believing that Plaintiff's franchise was the same company selling Roxberry-branded beverages nationwide

through Walmart. (Davis Decl. ¶ 35.) This is powerful evidence that the marketplace cannot distinguish between the two companies.  This factor favors Plaintiff.

* * *

In sum, all six factors point in one direction: confusion is likely. Plaintiff has demonstrated a strong likelihood of success on the merits of its trademark infringement claims.

This case also presents a textbook example of *reverse confusion*—where a junior user's vastly greater market presence overwhelms the senior user's mark. *See Ameriquest Mortgage Co. v. Ameriquest, Inc.*, 2002 WL 31415608, at *5 (D. Kan. 2002) (recognizing reverse confusion claims in the Tenth Circuit). Defendant's rapid expansion to over 3,100 retail locations nationwide, backed by substantial capital and advertising, threatens to "swamp" Plaintiff's mark—causing consumers to mistakenly believe that the senior user is the infringer, or that Plaintiff is affiliated with or has rebranded as Defendant. This dynamic makes injunctive relief particularly urgent, because reverse confusion erodes the senior user's ability to control its own brand identity and business trajectory. (Davis Decl. ¶¶ 37–39, 42–45.)

## II.  Plaintiff Will Suffer Irreparable Harm Absent Preliminary Relief

"There are few things in our commercial life more valuable than a company's reputation, goodwill, and trademarks." *By-Rite Distributing, Inc. v. Coca-Cola Co.*, 577 F. Supp. 530, 541 (D. Utah 1983).

### A.  The Statutory Presumption of Irreparable Harm Applies

Under the Trademark Modernization Act of 2020, "[a] plaintiff seeking any . . . injunction under [Section 34 of the Lanham Act] shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation . . . or upon a finding of likelihood of success on the merits for a violation." 15 U.S.C. § 1116(a) (as amended by Pub. L. No. 116-260, § 226(a)). This presumption

KNH LLP | cpehrson@knh.law

expressly applies to preliminary injunction proceedings. *See Nichino America, Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 195–96 (3d Cir. 2022) (establishing three-step framework for TMA presumption under Fed. R. Evid. 301). Because Plaintiff has demonstrated a likelihood of success on the merits, the presumption of irreparable harm attaches, and the burden of production shifts to Defendant to rebut it.

Defendant cannot rebut this presumption. Unlike the sophisticated purchasers of agricultural pesticides in *Nichino*, Defendant's products are impulse-priced canned beverages marketed to families with young children—precisely the consumer class least likely to exercise careful purchasing discrimination. Moreover, Defendant's willful conduct after receiving the USPTO Office Action, including its failure to respond to Plaintiff's cease-and-desist letter, strongly militates against rebuttal. Where a defendant acts intentionally and with knowledge of the plaintiff's trademark, the presumption of irreparable harm is particularly resistant to rebuttal. *See Nichino*, 44 F.4th at 197–98; *see also* Fara Sunderji & Sandra Edelman, *Delay in Filing Preliminary Injunction Motions: 2023 Edition*, 113 Trademark Rep. 375, 392 (2023) (noting courts find presumption unrebutted where defendant acted with knowledge of prior mark).

### B. The Traditional Irreparable Harm Analysis Also Favors Plaintiff

Even absent the statutory presumption, irreparable harm is independently established. "Confusion as to the quality and sponsorship of the products sold and damage to the claimant's goodwill and reputation for high quality products is, in itself, irreparable injury sufficient to support an injunction." *By-Rite*, 577 F. Supp. at 541; *see also Equitable Nat. Life*, 434 F. Supp. 3d at 1241 (loss of control over reputation and goodwill constitutes irreparable harm).

Plaintiff is suffering irreparable harm right now. Every day, Defendant sells ROXBERRY-branded beverages in more than 3,000 retail locations across the United States. (Compl. ¶¶ 31–33;

Davis Decl. ¶¶ 28–29.) Consumers encountering Defendant's products may believe they are affiliated with, sponsored by, or connected to Plaintiff's established brand. This kind of trademark injury is inherently difficult to quantify in monetary terms, which is precisely why it is irreparable. *See Harris Research*, 505 F. Supp. 2d at 1168.

### C. Loss of Quality Control Compounds the Harm

The harm is not merely abstract brand confusion—it strikes at the heart of Plaintiff's reputation for quality. Plaintiff built the ROXBERRY brand over nearly two decades around fresh, made-to-order smoothies and juices prepared from whole fruits and vegetables in its franchise locations. Defendant sells mass-produced, carbonated canned beverages. Both companies sell fruit-based drinks to health-conscious families—which is precisely why the confusion is so damaging and why Plaintiff has no ability to control the quality narrative.

When a consumer purchases Defendant's "Roxberry Fizz" expecting the quality and health standards associated with Plaintiff's established brand, and instead receives a carbonated drink, that consumer may conclude that Plaintiff has "sold out" or degraded its quality standards. This is the classic "loss of quality control" that courts have long recognized as irreparable harm in trademark cases. *See Equitable Nat. Life*, 434 F. Supp. 3d at 1241 (loss of control over reputation constitutes irreparable harm); *By-Rite*, 577 F. Supp. at 541 ("damage to the claimant's goodwill and reputation for high quality products is, in itself, irreparable injury"). Plaintiff has no ability to control the quality, safety, or consumer experience of Defendant's products—yet those products trade on Plaintiff's name and nearly two decades of goodwill.

### D. The Timing of This Motion Reflects Progressive Encroachment, Not Delay

Defendant may argue that Plaintiff should have acted sooner. But the doctrine of progressive encroachment defeats any such contention. Under this well-established doctrine, the

KNH LLP | cpehrson@knh.law

period of delay in a trademark infringement case is measured not from when a claimant first learned of the allegedly infringing mark, but from when that infringement first became actionable. *A.I.G. Agency, Inc. v. Am. Int'l Grp., Inc.*, 33 F.4th 1031, 1035 (8th Cir. 2022). The doctrine "saves trademark holders from being hoisted upon the horns of an inequitable dilemma—sue immediately and lose because the alleged infringer is insufficiently competitive to create a likelihood of confusion, or wait and be dismissed for unreasonable delay." *Id.* at 1036.

That dilemma squarely applies here. When Defendant first appeared in the market in late 2024, its products had limited distribution and its national footprint was minimal. Defendant was, at that point, a regional entrant whose competitive overlap with Plaintiff's franchise network was uncertain. But in January 2026, Defendant's conduct underwent a qualitative transformation. Its products flooded 2,200 Walmart stores across all 50 states, plus hundreds of Kroger, Meijer, and Harris Teeter locations. Defendant began appearing prominently in search results for the term "Roxberry," actively diverting Plaintiff's customers. While Defendant was a minor irritant in 2024, it became an existential threat to Plaintiff's brand in January 2026. *This* is the triggering event— the moment Defendant's progressive encroachment matured into imminent, irreparable harm.

Plaintiff acted promptly. Brad Davis first discovered the scope of Defendant's expansion through a franchise partner on or about January 13, 2026. (Compl. ¶ 35; Davis Decl. ¶¶ 42–45.) Plaintiff investigated, consulted counsel, sent a cease-and-desist letter, and filed this action—all within weeks of learning of the Walmart expansion. There has been no unreasonable delay. *See Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 991 (9th Cir. 2009) (no unreasonable delay where plaintiff filed suit after defendant expanded from regional to nationwide service).

The urgency is compounding. Defendant's rapid nationwide expansion means that the longer this Court waits to act, the more deeply the infringing mark becomes entrenched in the marketplace and the more difficult it becomes to undo the damage to Plaintiff's brand.

### III.  The Balance of Equities Tips Decidedly in Plaintiff's Favor

On one side of the scale stands Plaintiff: the senior user since 2008, with a federal trademark registration, a family-owned multi-state franchise system, and nearly two decades of goodwill built under the ROXBERRY name. On the other stands Defendant: a junior user that entered the market sixteen years later, with actual notice of Plaintiff's prior rights courtesy of the USPTO's own Office Action, and which ignored a cease-and-desist letter.

Any hardship to Defendant is entirely self-inflicted. *See Equitable Nat. Life*, 434 F. Supp. 3d at 1241 ("[T]he harm to [defendant] is self-inflicted due to [defendant's] awareness of [plaintiff's] prior use."). Defendant adopted the ROXBERRY mark at its peril. "[O]ne who adopts a mark similar to another already established in the marketplace does so at his own peril." *Beer Nuts*, 711 F.2d at 941. Plaintiff's federal registration provides constructive notice of Plaintiff's claims. 15 U.S.C. § 1072. The May 2025 Office Action provided actual notice. And the cease-and-desist letter made Plaintiff's objections explicit. Defendant chose to expand aggressively in the face of all of this. It cannot now claim surprise or inequitable hardship.

The sequence of events is devastating to any claim of hardship by Defendant. Defendant had not one, but two clear "exit ramps" to avoid the very predicament it now faces. The first was May 2025, when the USPTO Office Action put Defendant on unambiguous notice that its ROXBERRY mark was confusingly similar to Plaintiff's. The second was November 2025, when Defendant abandoned its word mark application—implicitly conceding the USPTO's finding— without even attempting to rebrand. At either juncture, Defendant could have pivoted at minimal

cost while its products were still in limited distribution. Instead, Defendant chose to speed up. It expanded into 2,200 Walmart stores and thousands of additional retail outlets *after* the government told it the marks were confusingly similar. The "hardship" of now pulling products from those shelves is a consequence of Defendant's own strategic gamble, not Plaintiff's enforcement of its established rights.

Moreover, Defendant has been in the market for only approximately 16 months—far less time than Plaintiff's nearly 18 years. The cost of rebranding at this early stage is modest compared to the irreversible erosion of Plaintiff's goodwill. Defendant "can continue to operate" its business "as long as it uses a different name and mark." *See Mason-Dixon Polling & Strategy, Inc. v. Mayson-Dixon Strategic, LLC*, No. RDB-17-2671, 2018 WL 3752828, at *6 (D. Md. Aug. 8, 2018). The balance tips firmly in Plaintiff's favor.

## IV.  A Preliminary Injunction Serves the Public Interest

"Infringement and dilution of trademarks are inherently contrary to the public interest." *Harris Research*, 505 F. Supp. 2d at 1169. The Lanham Act is, at its core, a consumer-protection statute. Its purpose is to ensure that consumers can rely on trademarks to identify the source of goods and services. *See By-Rite*, 577 F. Supp. at 542 ("[P]ublic interest is better served by [the] public's being assured of quality.")

The public has an interest in not being confused about the source of the beverages it buys—particularly when those beverages are marketed to children and families. When a consumer sees "Roxberry" on a can of soda and believes it is associated with the Roxberry Juice Co. brand they have patronized for years, that consumer is deceived. An injunction preventing that deception serves the public interest. *See Equitable Nat. Life*, 434 F. Supp. 3d at 1243 (public interest favors preventing marketplace confusion).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court enter a preliminary injunction:

(a)  Enjoining Defendant, its officers, agents, employees, attorneys, and all persons acting in concert or participation with them, from using the ROXBERRY mark or any confusingly similar mark in connection with the advertising, marketing, distribution, or sale of any goods or services;

(b)  Ordering Defendant to cease all sales, marketing, and distribution of products bearing the ROXBERRY mark or any confusingly similar mark;

(c)  Ordering Defendant to remove from all retail locations any products, packaging, displays, and promotional materials bearing the ROXBERRY mark;

(d)  Ordering Defendant to suspend all search advertising, search engine optimization, and internet marketing using the ROXBERRY mark; and

(e)  Granting such other and further relief as this Court deems just and proper.

Plaintiff is prepared to post a bond in an amount the Court deems appropriate under Federal Rule of Civil Procedure 65(c). Given Plaintiff's overwhelming likelihood of success, Plaintiff respectfully submits that a nominal bond is warranted. *See Crowe & Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1155 (10th Cir. 2011) (affirming nominal bond where likelihood of success was strong).

DATED this 11th day of February, 2026.

Respectfully submitted,

**KNH LLP**

*/s/Chad Pehrson*
*Attorneys for Plaintiff*
*Roxberry Licensing, LLC*

KNH LLP | cpehrson@knh.law