Aaron T. Brogdon (009796)
**FBT Gibbons LLP**
10 W. Broad St., Ste. 2300
Columbus, Ohio 43215
Telephone: 614-559-7262
Email: abrogdon@fbtgibbons.com

*Attorneys for Defendant and Counterclaimant*
*Roxberry Naturals, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **ROXBERRY LICENSING, LLC**, <br><br> Plaintiff and Counter-Defendant, <br><br> v. <br><br> **ROXBERRY NATURALS, INC.** <br><br> Defendant and Counter-Plaintiff | **DEFENDANT ROXBERRY NATURALS' RESPONSE TO PLAINTIFF ROXBERRY LICENSING, LLC'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Case No. 2:26-cv-00126-JNP-JCB <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Jared C. Bennet |

1

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 7

STATEMENT OF CONTESTED FACTS ...................................................................... 7

ARGUMENT ................................................................................................................... 8

I.      Preliminary Injunction Standard ..................................................................... 8

II.     Plaintiff Cannot Show a Substantial Likelihood of Success on the Merits ...................... 10

    A.      The Ownership and Validity of Plaintiff's Mark are in Dispute ........................... 11

    B.      There is No Likelihood of Confusion ................................................................. 11

        1.      Similarity of the Marks ................................................................... 12

        2.      Similarity of the Products ................................................................ 16

        3.      Defendant's Intent .......................................................................... 17

        4.      There is No Credible, Admissible Evidence of Actual Confusion ........... 19

        5.      Degree of Purchaser Care ................................................................ 21

        6.      Strength of Plaintiff's Mark ............................................................ 22

III.    Plaintiff Cannot Demonstrate (and Will Not Suffer) Irreparable Harm ..................... 23

IV.     The Balance of Equities Favors Defendant ...................................................... 27

V.      A Preliminary Injunction Would Be Contrary to the Public Interest ..................... 30

VI.     Plaintiff's Proposed Bond Amount Would Be Woefully Inadequate ..................... 31

CONCLUSION ............................................................................................................... 31

CERTIFICATE OF SERVICE ...................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*,
 2024 U.S. Dist. Lexis 41402 (D. Utah Mar. 8, 2024)................................................................8

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter.
 Mgmt. Consultants, Inc.*,
 883 F.2d 886 (10th Cir.1989) .....................................................................................................8

*Colo. Mont. Wyo. State Area Conf. of the NAACP v. United States Election
 Integrity Plan*,
 No. 22-cv-00581-PAB, 2022 WL 1061906 (D. Colo. Apr. 8, 2022) ......................................24

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
 269 F.3d 1149 (10th Cir. 2001) ...............................................................................................23

*Equifax Servs., Inc. v. Hitz*,
 905 F. 2d 1355 (10th Cir. 1990) .................................................................................................8

*Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*,
 434 F. Supp. 3d 1227 (D. Utah 2020)....................................................................10, 13, 18, 29

*Garcia v. Google, Inc.*,
 786 F.3d 733 (9th Cir. 2015) (en banc) ...................................................................................24

*Gen. Motors Corp. v. Urb. Gorilla, LLC*,
 500 F.3d 1222 (10th Cir. 2007) .................................................................................................9

*GTE Corp. v. Williams*,
 731 F.2d 676 (10th Cir. 1984) .....................................................................................10, 24, 28

*Happy Sumo Sushi, Inc. v. Yapona, Inc.*,
 2008 WL 3539628 (D. Utah Aug. 11, 2008) .............................................................................9

*Harley's Hope Found. v. Harley's Dream*,
 No. 22-CV-0136-WJM-STV, 2022 WL 1154526 (D. Colo. Apr. 19, 2022)............................23

*Heartsprings, Inc. v. Heartspring, Inc.*,
 143 F.3d 550 (10th Cir. 1998) .......................................................................................... passim

*Heideman v. S. Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) ...............................................................................23, 30

*Hornady Mfg. Co., Inc. v. Doubletap, Inc.*,
   746 F.3d 995 (10th Cir. 2014) .................................................................................19, 22

*Ixmation, Inc. v. Switch Bulb Co., Inc.*,
   2014 WL 5420273 (N.D. Ill. Oct. 23, 2014)....................................................................24

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
   185 F.3d 1084 (10th Cir. 1999) ...........................................................................12, 19, 21

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
   968 F. Supp. ................................................................................................................21

*Logan v. Pub. Emps. Ret. Ass'n*,
   163 F. Supp. 3d 1007 (D.N.M. 2016) ............................................................................10

*M Welles and Associates, Inc. v. Edwell, Inc.*,
   69 F.4th 723 (10th Cir. 2023) .......................................................................................19

*Mushroom Makers, Inc. v. R. G. Barry Corp.*,
   441 F. Supp. 1220 (S.D.N.Y. 1977), judgment aff'd, 580 F.2d 44 (2d Cir.
   1978) ...........................................................................................................................18

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
   389 F.3d 973 (10th Cir.2004) .........................................................................................9

*Packerware Corp. v. Corning Consumer Products Co.*,
   895 F.Supp 1438 (D. Kan. 1995)...............................................................16, 17, 18, 30

*PickMeUp Med. Transp., LLC v. Utah Dep't of Health*,
   2013 WL 6185042 (D. Utah Nov. 26, 2013) ...................................................................8

*Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*,
   669 F. Supp. 2d 1235 (D. Colo. 2009)......................................................................19, 29

*Prime Media, Inc. v. Primedia, Inc.*,
   33 F. Supp. 2d 932 (D. Kan. 1998).............................................................................18, 30

*Primedia Intertec Corp. v. Technology Marketing Corp.*,
   35 F. Supp.2d 809 (D. Kan. 1998).................................................................................30

*Salient Power Solutions, LLC v. Cullari Industries, LLC*,
   2023 WL 3847307 (D. Colo. 2023)...............................................................................25

*Sally Beauty Co., Inc. v. Beautyco, Inc.*,
 304 F.3d 964 (10th Cir.2002) ..................................................................................19

*Schrier v. Univ. of Co.*,
 427 F.3d 1253 (D. Colo. 2005) ..........................................................................8, 9, 10

*Silber v. Barbara's Bakery, Inc.*,
 950 F. Supp. 2d 432 (E.D.N.Y. 2013) ......................................................................24

*Sunrise Home Health Care, LLC v. Erickson*,
 2011 WL 3240441 (D. Utah, July 28, 2011) ...........................................................8

*Thaler v. Perlmutter*,
 130 F.4th 1039 (D.C. Cir. 2025), cert. denied, No. 25-449, 2026 WL 568327
 (U.S. Mar. 2, 2026) ..................................................................................................20

*Thaler v. Vidal*,
 43 F.4th 1207 (2022)................................................................................................20

*Universal Money Centers, Inc. v. AT & T Co.*,
 797 F.Supp. 891 (D.Kan.1992), aff'd, 22 F.3d 1527 (10th Cir.), *cert. denied*,
 513 U.S. 1052 (1994)...............................................................................................17

*Universal Money Ctrs. Inc. v. American Tel. & Tel. Co.*,
 22 F.3d 1527 (10th Cir.1994) ........................................................................11, 13, 14

*Uyte, LLC v. Mammoth Hockey, LLC*,
 2025 WL 3872248 (D. Utah, 2025) .........................................................................26

*Water Pik, Inc. v. Med-Sys., Inc.*,
 726 F.3d 1136 (10th Cir. 2013) ................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008).....................................................................................................30

**Statutes**

15 U.S.C. § 1072.................................................................................................................23, 24

15 U.S.C. § 1115(b) ................................................................................................................11

Lanham Act................................................................................................................................20

Trademark Modernization Act..................................................................................................23

**Other Authorities**

Fed. R. Ev. 801 ..................................................................................................................21

Federal Rules of Civil Procedure Rule 65 ...........................................................................7

## INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and DUCivR 7-1(a), Defendant Roxberry Naturals, Inc. ("**Roxberry Naturals**" or "**Defendant**") hereby submits this opposition to Plaintiff Roxberry Licensing, LLC ("**Roxberry Licensing**" or "**Plaintiff**") *Motion for Preliminary Injunction* [Dkt. 16] (the "**Motion**"), which asks the Court to upset the current status quo and order Defendant to essentially recall and rebrand products it has been selling under its Roxberry mark since 2024, during which time Plaintiff has had knowledge of such use for at least a year prior to filing its Motion.  For that and the other reasons below, the Motion should be denied.

## STATEMENT OF CONTESTED FACTS

Without waiving any right to contest any factual issues at later stages of this proceeding, Defendant contests the following facts in Plaintiff's Motion:

Defendant contests that Plaintiff's Registration No. 5,495,492 is either an incontestable or valid registration, and that Defendant has common law rights in the ROXBERRY mark in any location outside Idaho or Utah. [Dkt. 16, p. 3].

Defendant contests that Plaintiff first learned of Defendant's activities on or about January 13, 2026; Plaintiff has had constructive notice of Defendant's use of its ROXBERRY mark since at least as early as March 25, 2025. *Id.* at p.4.

Defendant contests that any actual confusion has occurred and contests all facts alleged by Plaintiff in support of Plaintiff's allegation of actual confusion. *Id.* at p.5.

## **ARGUMENT**

### I.    **Preliminary Injunction Standard**

The essential purpose of a preliminary injunction is to *preserve*, rather than *upset*, the status quo.  See *Schrier v. Univ. of Co.,* 427 F.3d 1253, 1258-59 (D. Colo. 2005) (*citing Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, (1981)).  Given the nature of such relief, this Court and others have noted that "[a] preliminary injunction is an extraordinary remedy, and thus the right to relief must be clear and unequivocal." *Sunrise Home Health Care, LLC v. Erickson,* 2011 WL 3240441, at * 1 (D. Utah, July 28, 2011); *see also Schrier,* 427 F.3d at 1258-59; *Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.,* 2024 U.S. Dist. Lexis 41402, at *9 (D. Utah Mar. 8, 2024).

A preliminary injunction "constitutes drastic relief to be provided with caution," and thus "should be granted only in cases where the necessity for it is clearly established." *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir.1989). As such, a preliminary injunction is the exception, rather than the rule. *See PickMeUp Med. Transp., LLC v. Utah Dep't of Health,* 2013 WL 6185042, at *3 (D. Utah Nov. 26, 2013).  A court may grant a motion for preliminary injunction only if the movant can satisfy the following elements:

> (1) *substantial likelihood* that the movant will eventually prevail on the merits;
> (2) a *showing* that the movant will suffer irreparable injury [without] the injunction ...;
> (3) *proof* that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and
> (4) a *showing* that the injunction … would not be adverse to the public interest.

*Equifax Servs., Inc. v. Hitz,* 905 F. 2d 1355, 1360 (10th Cir. 1990) (emphasis added). Courts in the Tenth Circuit have repeatedly emphasized that this is a high bar.

The Tenth Circuit has also repeatedly held that certain types of injunctions present additional risks of creating inequitable results toward the nonmoving party, unduly increasing the burden on the judiciary, or undermining the very purpose of a preliminary injunction itself. The Tenth Circuit has identified three categories of preliminary injunctions that are "specifically disfavored" and which thus receive a heightened degree of scrutiny:

> (1) preliminary injunctions that alter the status quo;
> (2) mandatory preliminary injunctions; and
> (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.

*See Schrier,* 427 F.3d at 1258-59 (*citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 977 (10th Cir.2004)); *see also, e.g., Happy Sumo Sushi, Inc. v. Yapona, Inc.,* 2008 WL 3539628 (D. Utah Aug. 11, 2008).

Injunctive relief falling into any of these three categories "operates outside of the normal parameters for interim relief" and thus "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente,* 389 F.3d at 975-76. Accordingly, a movant seeking a preliminary injunction that falls within any one of these three "disfavored" categories faces an "even heavier burden" with regard to the four elements and "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.; see also Gen. Motors Corp. v. Urb. Gorilla, LLC,* 500 F.3d 1222, 1226 (10th Cir. 2007).

This "heightened burden" and close scrutiny must be applied when a movant seeks an injunction falling in *any one* of the three historically disfavored categories identified in *Schrier.* Here, the injunction sought by Plaintiff falls into all three. Defendant has offered its beverage goods in commerce since late 2024, and the longstanding "status quo" would be disrupted if

Defendant were forced to stop using its mark. Moreover, the injunction sought by Plaintiff would also require Defendant to "affirmatively notify all of its retail distributors" (among many other extremely expensive and onerous steps) and to essentially recall and rebrand its products prior to the central issues in this case being decided.  See *Schrier.*, 427 F.3d at 1259. Thus, granting the Motion would in effect grant Plaintiff all of the relief it could receive at trial, while essentially killing Defendant's brand. *Cf. GTE Corp. v. Williams,* 731 F.2d 676 (10th Cir. 1984).

For all these reasons, the Court should deny Plaintiff's Motion.

## II.    Plaintiff Cannot Show a Substantial Likelihood of Success on the Merits

In order to prevail on the crucial substantial-likelihood-of-success prong, "the movant must (i) carry the burden of production, *i.e.*, he or she must present a prima facie case; and (ii) make it reasonably likely—beyond just being 'not unreasonable'—that the factfinder would actually find for the movant, *i.e.*, that the movant would satisfy the burden of persuasion." *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1032 (D.N.M. 2016). This standard is "an exacting one" in general; this exacting standard is further heightened when the injunction sought is within one of the three disfavored categories discussed above. *Id.*

In turn, to succeed on its trademark infringement claims, Plaintiff would be required to demonstrate that "(1) it has a protectable mark; (2) [Defendant] used [Plaintiff's trademark; and (3) [Defendant's] use creates a likelihood of confusion." *Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 (D. Utah 2020). As discussed below, Plaintiff has not carried its burden of production or persuasion as to any of these elements under either the "exacting" standard generally applied to preliminary injunctions nor under the "heightened" standard applied to disfavored preliminary injunctions such as that sought here.

### A.      *The Ownership and Validity of Plaintiff's Mark are in Dispute*

Plaintiff's Motion does not explicitly acknowledge this element as a requirement for its Motion to prevail. Rather, the Motion glosses over this element and merely claims that Plaintiff's ownership of a registration "establishes Plaintiff's ownership and the validity of the mark as a matter of law." [Dkt. 16, p. 7]. Plaintiff is mistaken, however, as ownership and validity of its mark have not been conclusively established. Indeed, Plaintiff disregards Defendant's counterclaim for cancellation of Plaintiff's registration on the grounds of Plaintiff's fraud on the USPTO which, if successful, would invalidate Plaintiff's registration, the registration's evidentiary value, and the presumptions of validity and ownership. 15 U.S.C. § 1115(b) (fraud is available as a challenge to even an incontestable registration). Because Plaintiff carries both the burden of proof, and because Plaintiff has done nothing to address this threshold requirement beyond pointing to its registration, the analysis should stop here, and the Court should deny Plaintiff's Motion.

### B.      *There is No Likelihood of Confusion*

The Tenth Circuit analyzes six factors in order to determine whether a likelihood of confusion exists between two marks: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. *Universal Money Ctrs. Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1530 (10th Cir.1994). "This list [of factors] is not exhaustive. All of the factors are interrelated, and no one factor is dispositive." *Id.* "[Even where] a Plaintiff's trademarks have become incontestable… the party alleging infringement has the burden of proving likelihood of confusion." *Id.*  Plaintiff has

not met this burden.  Not only do the facts, when viewed in the proper context of marketplace realities, obviate the likelihood for confusion, Plaintiff's legal briefing, littered with mischaracterizations of legal holdings, only underscores that Plaintiff has not, and cannot, show that a likelihood for confusion exists in this case.

### 1.   *Similarity of the Marks*

Plaintiff would have this Court believe that the act of dissection is appropriate in this case. It is not. For over a century, it has been black letter law that, when determining whether two trademarks are similar, it is improper to dissect the marks by splitting them up into component parts. "The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety." 3 McCarthy on Trademarks and Unfair Competition § 23:41 (5th ed.) (citing *Estate of P. D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46 (1920)).

While Plaintiff, citing *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.,* contends that this Court applies a rule that "when two companies use the same core word in related industries, design differences do not prevent confusion" [Dkt. 16], the 10th Circuit has made clear that the *anti*-dissection rule applies in the context of compound marks that combine both word and design elements. "Conflicting marks consisting of both words and pictorial symbols must be compared in their *entireties* to determine likelihood of confusion" *King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1090 (10th Cir. 1999). Plaintiff's proffered analysis runs contrary to the Tenth Circuit's direct imperative that, "because [the Court] must consider the parties' trademarks in their entirety as they are experienced by consumers in the marketplace, [the

Court] is not free to focus solely on name similarity," but rather must also consider the presentation of each mark. *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550 (10th Cir. 1998).

Contrary to Plaintiff's position, *Equitable* does not stand for a *per se* rule that design elements cannot outweigh shared wording when determining confusing similarity between trademarks. Rather, the Court in *Equitable* specifically emphasized that the marks there at issue not only shared dominant wording, but also shared a visually similar *depiction* of this shared wording, noting that both marks in that case displayed the word with horizontal orientation, in all capital letters, in a similar font, and in a similar color. *Equitable Nat'l Life Ins. Co.,* 434 F. Supp.3d at 1246. To be clear, the Court's finding was not that "design differences do not prevent confusion" as the Plaintiff contends, but rather that the visual similarities shared by the dominant word in each parties' mark outweighed the differences as to other portions of the mark. *Id.*

Plaintiff's citation to *Harris Research, Inc. v. Lydon* similarly mischaracterizes the facts and holding of that case. 505 F.Supp.2d 1161, 1167 (D. Utah 2007). Plaintiff frames *Harris* as holding that the marks were "virtually identical in design" because "only three letters [were] different" between the marks at issue. [Dkt. 16]. But upon reading the full quotation from which Plaintiff's quoted language is drawn, the Court's holding was rather that the marks were similar because *both* the wording *and* stylization thereof were nearly identical:

> The marks at issue in this case are virtually identical in design, the stylized lettering in the words are the same, there are only three letters that are different in the marks, and the graphics are virtually identical. This high degree of similarity weighs heavily in favor of infringement.

*Harris,* 505 F. Supp.2d at 1167.

The instant case is rather like *Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527 (10th Cir. 1994).   There, the Tenth Circuit found confusion was unlikely as a matter

of law between the plaintiff's UNIVERSAL MONEY CARD and other marks on the one hand, and the defendant's AT&T UNIVERSAL CARD mark on the other hand, explicitly holding that while the shared term UNIVERSAL was the dominant element of both parties' marks, reasonable jurors could nevertheless *only* conclude that the degree of similarity between the marks was minimal, based on the additional wording in each mark, the differences in how each mark was presented (specifically, the style of the lettering, color schemes, and logos), the differences in sound and cadence, and the differences in the idea and meaning conveyed *Id.* at 1531.

With a view to this legal framework, and given the differences in the respective marks, it is not surprising that Plaintiff has attempted to frame this case as being simply a "Roxberry" vs. "Roxberry" issue. Here, however, Plaintiff's Mark, in its entirety, is not simply "Roxberry," but rather a compound mark consisting of the words "ROXBERRY JUICE CO." and design elements:



In turn, Defendant's mark is "ROXBERRY" in the stylized format shown below:



Like the marks at issue in *Universal*, Plaintiff's mark is immediately followed by additional wording, namely "JUICE CO.", giving the mark a different "sound and cadence" than Defendant's mark while changing the meaning conveyed and the "mental reaction" evoked by the mark. The marks are also depicted in entirely different stylizations. Plaintiff's ROXBERRY JUICE CO. mark utilizes a "retro" or "throwback" inspired motif, and displays the word "ROXBERRY" in a large,

flowing cursive font, neatly enclosed by a white outline, reminiscent of the funky, disco-inspired, "groovy" branding popular in America in the 1970s.

In the context of Roxberry Licensing's other branding, which emphasizes 70's style floral patterns and similar "retro" designs, this stylistic depiction of the word "ROXBERRY" in the ROXBERRY JUICE CO. Mark immediately uses nostalgia to communicate to consumers a connection between Plaintiff's brand and a time when food was simpler. And, perhaps, when even countercultural movements such as the "flower power" style inspiring the brand fit into neat and predictable boxes: the word "ROXBERRY" is depicted in all lowercase, and the cursive font is the same throughout the entire word. This wording is followed by the wording "JUICE CO.," depicted in a more-modern block font and in all caps, as if to root the consumer in this sense of predictability while communicating that the brand also incorporates developments from modern and science-based health food movements. The design is tied together by four stylized droplets extending from the letter "Y," in the word "ROXBERRY," positioned in a shape which simultaneously mimics a cross-section of a citrus fruit while also suggesting a splash of juice, evoking the fresh fruits being squeezed and juiced within Plaintiff's smoothie bars.

In contrast to Plaintiff's mark, Defendant's mark immediately conveys the kid-friendly and kid-focused nature of Defendant's brand, utilizing whimsical design elements that would not be out of place in a children's book or cartoon. The font is distinctly modern, and consumers will immediately notice that each letter in the mark is depicted in both a different size and font from one another, emphasizing that both fun and imagination are core elements of the brand. The lines at the bottom of the first letter "R" in the mark are stylized to look like cartoon legs, as if it was mid-step and walking towards the other letters; the second letter "R" features a bottom line stylized

15

to look like a hand reaching back towards the beginning of the mark, creating a sense of visual symmetry without actually creating any predictable pattern that would be contrary to the whimsical, no-rules feel the brand conveys to its consumers. By contrast, the letter "O" is stylized in a unique pinwheel shape, with the hole of the "O" both off-center and disproportionately small; a child being given a ROXBERRY beverage by their parent could imagine this "O" to be a sun, or a gear in a machine, or any number of other things – and that is the point.

### 2.      *Similarity of the Products*

Here, the respective goods are also distinguishable, and the marks are encountered in entirely different contexts and commercial applications. Differences in respective types of goods is a relevant consideration. *Packerware Corp. v. Corning Consumer Products Co.*, 895 F.Supp 1438, 1450 (D. Kan. 1995). Marketing practices of the parties are also relevant, and of particular importance in a trademark infringement case because these practices directly impact on the way in which consumers experience the parties' respective marks. *Heartsprings*, 143 F.3d at 556.

Plaintiff sells smoothies, acai bowls, and fresh juice. Notably, all of Plaintiff's products have one key factor in common, which is heavily emphasized in Plaintiff's marketing and website: they all contain fresh ingredients and are made in-store. *See* Menu, ROXBERRY JUICE CO., https://www.roxberryjuice.com/menu (last visited Apr. 7, 2026). As to its juices, Plaintiff even recommends to consumers that they place an order for their juice by 8PM the prior day to allow time for preparation and allows consumers to pick up the juices only at 10AM on Mondays and Thursdays. *Id.* The words FRESH and FRESHNESS appear a collective total of thirteen times on Plaintiff's online menu. *Id.* Thus, Plaintiff's fresh smoothie and related goods are of a type

16

customers are accustomed to obtaining exclusively from outlets that sell only such products, and consumers see Plaintiff's goods exclusively in the context of Plaintiff's smoothie-bar locations.

Defendant's goods, by contrast, are carbonated soda alternatives. These goods come in a can, a method of packaging designed to preserve food and beverage items for long periods of time, a process not used in relation to fresh fruit juices. Given that Plaintiff markets all of its goods as being "fresh" and its preparation methods as "guaranteeing freshness," consumers encountering a ROXBERRY mark in use on canned goods, which by definition are not fresh, in a grocery store beverage aisle alongside other sodas and beverages that were shipped to such store by third parties, will not assume that these goods emanate from Plaintiff. *See* Menu, ROXBERRY JUICE CO., https://www.roxberryjuice.com/menu (last visited Apr. 7, 2026).

Given these differences, Plaintiff resorts to claiming that the market channels are "converging" on the basis that "Plaintiff is actively expanding into those exact same grocery stores." [Dkt. 16, p. 10]. This is inapposite. A ***plaintiff's*** intent to expand into new products or marketing channels is relevant ***only to the extent that consumers are aware*** of this intent. *See Packerware Corp. v. Corning Consumer Prods. Co.,* 895 F. Supp. 1438 (D. Kan. 1995); *Universal Money Centers, Inc. v. AT & T Co.*, 797 F.Supp. 891, 895 (D.Kan.1992), aff'd, 22 F.3d 1527 (10th Cir.), *cert. denied*, 513 U.S. 1052 (1994). This has no application or relevance here.

### 3.    *Defendant's Intent*

With regard to ***Defendant's*** intent, Plaintiff urges the Court to find that this factor favors Plaintiff, arguing that Defendant was "warned" that its mark was confusingly similar when the USPTO refused registration of Defendant's ROXBERRY *word* mark, and again when Defendant received Plaintiff's cease and desist letter. However, "[m]ere knowledge of a similar mark alone

17

is insufficient to find a party intended to copy its competitor." *Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d at 1247. Rather, the proper focus remains whether defendant had the intent to derive benefit from the goodwill of the plaintiff. *Id.*

Moreover, the USPTO "only determines issues of registrability, not issues of use of a trademark"; as such, while a USPTO rejection can be considered as persuasive authority, such rejections are typically given little persuasive value in likelihood of confusion determinations. *See Prime Media, Inc. v. Primedia, Inc.*, 33 F. Supp. 2d 932 (D. Kan. 1998) (refusal to register defendant's mark based on plaintiff's registration of little value for likelihood of confusion analysis); *Packerware Corp. v. Corning Consumer Prods. Co.*, 895 F. Supp. 1438 (D. Kan. 1995) (same); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F. Supp. 1220, 1230, (S.D.N.Y. 1977), judgment aff'd, 580 F.2d 44, (2d Cir. 1978).

Plaintiff would also have this Court believe that the office action issued by the USPTO rejection registration of Defendant's word mark application should be given great weight in Plaintiff's favor, while also professing that the USPTO's decision to grant registration of Defendant's design mark application should be given no weight in Defendant's favor. Plaintiff cannot have it both ways. Accordingly, and to the extent this Court affords persuasive value to the USPTO's decision to refuse an application for registration, the Court must also grant weight to the USPTO's decision to grant an application for registration.[1]

---

[1] The USPTO granted Defendant a trademark registration for its ROXBERRY design mark on March 25, 2025 for use in association with "Dietary and nutritional supplements; Dietary supplemental drinks" in Class 32, and despite the existence of Plaintiff's registration for its ROXBERRY design mark, namely Trademark Registration No. 5,495,492, meaning that the USPTO made an independent determination that Defendant's ROXBERRY *design mark* was not likely to cause confusion with any other registered mark, including Plaintiff's Defendant's ROXBERRY *design mark*.

As to Defendant's arguments regarding its letter, the Tenth Circuit, along with the majority of Courts in the United States, have held that continued use of a mark by a party after receipt of a cease-and-desist letter does not demonstrate an intent to cause confusion. *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1004, (10th Cir. 2014) (Rejecting the argument that continued use after receiving a cease and desist demand was evidence of an intent to copy or confuse.); *M Welles and Associates, Inc. v. Edwell, Inc.*, 69 F.4th 723, 733, (10th Cir. 2023). There are several good faith reasons why a party may continue use of a mark after receiving such a letter, including that they may have believed the allegation was without a legally supportable basis. 3 McCarthy on Trademarks and Unfair Competition § 23:120 (5th ed.).

With that, and because Plaintiff has put forth no other evidence to meet its burden, this factor favors Defendant.

### 4.       *There is No Credible, Admissible Evidence of Actual Confusion*

Plaintiff offers five instances of what Plaintiff claims to be "actual confusion." Even were the Court to find each of these instances to be true and credible instances of consumer confusion, this evidence would still be *de minimis* and insufficient to support a finding of likelihood of confusion. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999) (finding seven instances of consumer confusion to collectively be *de minimis* evidence of confusion); *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235 (D. Colo. 2009); *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir.2002).

Further, as to two of Plaintiff's alleged examples, Plaintiff does not actually allege that a single consumer has actually been confused. Plaintiff first argues that several artificial intelligence

("AI") models conflate the two brands.[2] Regardless of the veracity of this statement, Plaintiff does not cite a single case holding treating an AI model as equivalent to a "consumer" for purposes of demonstrating actual confusion. Indeed, courts have decided in several other contexts that artificial intelligence cannot be considered to be a legal "person." *See e.g., Thaler v. Perlmutter,* 130 F.4th 1039 (D.C. Cir. 2025), cert. denied, No. 25-449, 2026 WL 568327 (U.S. Mar. 2, 2026); *Thaler v. Vidal*, 43 F.4th 1207 (2022). It follows that a non-human AI model also cannot be a "consumer" under the Lanham Act. And as Plaintiff should be aware given that Plaintiff recently filed a brief *in this very case* generated by AI including miscited cases as well as citations to cases that do not exist, AI models are still in their relative infancy and often provide inaccurate information. As such, this evidence should be disregarded.

Similarly, Plaintiff alleges that influencers promoting Defendant's products use hashtags including the word "ROXBERRY," and that this somehow constitutes evidence of actual confusion. Assuming, *arguendo*, that Plaintiff's claim is factually true, Plaintiff does not explain how a use of the mark that would be attributable to Defendant (as Plaintiff alleges that Defendant paid these influencers) would constitute actual confusion. If Plaintiff is alleging that this use has *caused* actual confusion, it has provided no examples or evidence to support this position.

Plaintiff's remaining allegations of actual confusion are similarly flawed. The Tenth Circuit has found that anecdotal evidence of confusion "indicate[] only isolated instances of possible confusion) and should only be given little weight." *Heartsprings*, 143 F.3d at 557. Similarly, the Tenth Circuit affords little weight to evidence of confusion if attributable to "random

---

[2] Defendant notes that Plaintiff's reference to ChatGPT actually claims that the model "provides a warning that the brands appear to be separate entities," which demonstrates a lack of confusion by the model. [Dkt. 16, p. 5].

acquaintances [of Plaintiff]" as opposed to actual consumers. *Id.* Each remaining instance of actual confusion alleged by Plaintiff falls into both buckets.

To wit, the claim that Plaintiff's contractor Mr. Romney was confused upon seeing an MSN ad for Defendant does not show evidence of confusion among consumers, only by an "acquaintance" of Plaintiff. And Plaintiff's claim that an employee at a Roxberry Juice location informed Plaintiff they received a call from NASCAR, mistakenly believing Plaintiff to be Defendant and asking them to sponsor a car, is hearsay within hearsay and inadmissible. Fed. R. Ev. 801. Further, given that NASCAR is a multimillion-dollar organization with significant resources and licensing experience (and that NASCAR does not arrange sponsorships for cars, the owners of NASCAR teams do), it is unlikely that NASCAR would be unable to locate a decisionmaker at the company and instead would call a random Roxberry Juice Co. location. Given that this somewhat incredible claim is supported only by the Declaration of Plaintiff's CEO, it should be given little weight (if considered at all).

This leaves only Plaintiff's *claim* that it received an email from customer mistakenly attributing Defendant's goods to Plaintiff. Even if such hearsay were admissible, "probable confusion cannot be shown by pointing out that at someplace, at some time, someone made a false identification." *King of the Mountain*, 185 F. 3d at 1092. Thus, Plaintiff cannot satisfy this prong.

### 5.    *Degree of Purchaser Care*

This factor is neutral at best.  As discussed above, Plaintiff's goods and Defendant's goods are different and target different consumer bases. The Tenth Circuit has previously held that this factor may be "inapposite" if other factors indicate that it will not impact consumer perception, such as when marks are used for noncompeting products. *King of the Mountain Sports, Inc. v.*

*Chrysler Corp.*, 968 F. Supp. at 565 (*citing* 1 McCarthy on Trademarks and Unfair Competition, § 24 (4th ed., 1997)); *cf. Water Pik, Inc. v. Med-Sys., Inc.,* 726 F.3d 1136 (10th Cir. 2013).

> **6.** ***Strength of Plaintiff's Mark***

This factor depends on a mark's category of distinctiveness, of which there are five levels (each level being progressively stronger): (1) generic, meaning a term used to describe the relevant class of goods; (2) descriptive, meaning a term that describes a characteristics of a product or service; (3) suggestive, meaning a mark that suggests rather than describes a characteristic of the product and requires a consumer to use imagination, or make a "mental leap" to determine the product's nature; (4) arbitrary, a mark that has a common meaning, but that meaning is wholly unrelated to the product; or (5) fanciful, meaning a word that signifies nothing but the product. *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550 (10th Cir. 1998).

Here, Plaintiff's mark is a highly suggestive and "weak" mark. *See Hornady Mfg. Co., Inc. v. Doubletap, Inc.,* 746 F.3d 995, 1008, n.13, (10th Cir. 2014). Plaintiff sells smoothies that contain berries. [Dkt. 16, ¶ 13]. The word element ROX is likely to be read as an intentional misspelling (and thus the legal equivalent) of ROCKS, a laudatory term with limited distinctive meaning. *See* 1 McCarthy on Trademarks and Unfair Competition § 11:17 (5th ed.)(laudatory terms generally treated as descriptive or highly suggestive). Plaintiff's mark immediately informs consumers that its smoothies ROCK/ROX and contain BERRIES. While the use of the plural form of ROCK and singular form of BERRY renders this statement grammatically incorrect, and introduces some incongruity to the mark, this incongruity and resulting distinctiveness are thin; while there is some mental leap a consumer must make to connect Plaintiff's mark to its goods, the leap is small enough to be categorized as more of a mental hop. Such highly suggestive marks are generally considered

22

"weak" and entitled to only a limited scope of protection. *See* 1 McCarthy on Trademarks and Unfair Competition § 11:76 (5th ed.).

### III.     Plaintiff Cannot Demonstrate (and Will Not Suffer) Irreparable Harm

While Defendant submits that the Court should deny Plaintiff's Motion based solely on the Plaintiff's failure to show a substantial likelihood of success on the merits, the absence of any potential irreparable harm to Plaintiff provides another standalone basis for denial.  Numerous courts have noted that among the preliminary injunction elements, "a showing of probable irreparable harm is the single most important prerequisite." *Harley's Hope Found. v. Harley's Dream*, No. 22-CV-0136-WJM-STV, 2022 WL 1154526 (D. Colo. Apr. 19, 2022) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004). "A plaintiff suffers irreparable injury when the Court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Irreparable harm "must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

In the context of a trademark infringement claim, a defendant can rebut the presumption of irreparable harm that the Trademark Modernization Act affords to a trademark registrant by showing that the Plaintiff delayed in seeking injunctive relief and/or bringing suit. *Id.* That is precisely the case here.

Plaintiff has been aware of Defendant's trademark for no less than ten months, and likely longer. Registration of a trademark on the principal register constitutes constructive notice of the registrant's claim of ownership thereof. 15 U.S.C. § 1072.  On March 25, 2025, Defendant obtained

23

its Registration No. 7,739,892 for its stylized ROXBERRY, thereby placing Plaintiff on notice of Defendant's use of and claim of ownership to its ROXBERRY mark. The ten-month delay between Plaintiff receiving notice (in March 2025) notice and Plaintiff's Complaint is enough on its own to belie Plaintiff's claim that it faces a threat of great, actual, and irreparable harm. *Id. See also, e.g., GTE Corp. v. Williams,* 731 F.2d 676 (10th Cir. 1984) ("Delay in seeking relief, however, undercuts any presumption that infringement alone has caused irreparable harm"); *Colo. Mont. Wyo. State Area Conf. of the NAACP v. United States Election Integrity Plan,* No. 22-cv-00581-PAB, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (waiting three months to file motion for emergency injunctive relief without explanation "strongly undermines plaintiff's suggestion that the moment of maximum harm is now at hand") *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (five-month delay); *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *7–8 (N.D. Ill. Oct. 23, 2014) (four-and-a-half month delay); *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 441–42 (E.D.N.Y. 2013) (holding that a five-month delay "destroy[ed] a presumption of irreparable harm" in a false advertising case).

Moreover, any injury that Plaintiff would suffer before trial on the merits would be a relatively short extension of the status quo and perpetuation of any alleged injury Plaintiff might claim to have suffered over the past year. *See GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("The confusion or potential confusion has existed for a decade. Any injury that GTE would suffer before trial on the merits would be a relatively short extension of the injury that GTE knowingly suffered for three years before it filed suit."). This point is further borne out by the absence of any request for a temporary restraining order (which would clearly not be warranted) and the additional time that has passed since the filing of Plaintiff's Complaint, which was

24

followed by the filing, withdrawal, and refiling of this request for injunctive relief and then an amended complaint. *See Salient Power Solutions, LLC v. Cullari Industries, LLC*, 2023 WL 3847307 at *3 (D. Colo. 2023)(three month delay between complaint and filing of TRO undercut Plaintiff's claim of immediate and irreparable harm). This lack of urgency does not warrant a reversal of the status quo that has been in place for over a year (with Plaintiff on notice).

Furthermore, based upon Plaintiff's own cited evidence in support of its contention that there is a likelihood of confusion, it seems quite clear that Plaintiff knew or should have known about Defendant's mark much earlier than March 2025. According to Plaintiff's Motion, Plaintiff reached out to a Mr. James Romney "two and a half years ago" seeking advice and assistance with franchising outside of the two states in which Plaintiff currently operates. [Dkt. 16; 19]. Additionally, Plaintiff has engaged and worked with Phil Case and his company Max Connect Digital as Plaintiff's marketing agency, and this engagement includes consulting and advice in relation to digital marketing and search engine optimization. [Dkt. 16 at 5; Dkt. 18]. Mr. Case's declaration asserts that the two brands have become "algorithmically linked," such that consumers searching for Plaintiff's brand will inevitably encounter Defendant's brand, purportedly often before discovering Plaintiff's brand. *Id.* Though Mr. Case's Declaration does not specify when this engagement began, his analysis references social media posts dating as early as November 2024. In other words, on the one hand Plaintiff's Motion simultaneously claims that it is, and has been for well over a year, impossible for consumers to engage with Plaintiff's brand online (at least in states outside of Idaho and Utah) without encountering Defendant's brand and becoming confused. But on the other hand, Plaintiff claims that despite its active research and preparation for brand expansion in several new territories—which has included engaging both industry experts

and digital marketing experts for over two and a half years—Plaintiff nonetheless somehow remained unaware of Defendant's mark until January 2026. Plaintiff cannot have it both ways, and its own factual recitation clearly undermines this latter assertion.  Plaintiff cannot dispute that it has been well aware of Defendant's mark and its use in commerce for well over a year, during which time Plaintiff did nothing to pursue the relief it now belatedly asks the Court to enter.

Finally, setting aside Plaintiff's unreasonable delay in seeking relief, Plaintiff has not alleged any irreparable harm or injury that could not be fully addressed by an award of monetary damages. For instance, Plaintiff has offered no evidence or argument to suggest that its customer relationships have been harmed or that Defendant's alleged actions have somehow harmed Plaintiff's goodwill or market position. *Uyte, LLC v. Mammoth Hockey, LLC*, 2025 WL 3872248 (D. Utah, 2025). Notably, in *Uyte,* this Court found that the moving party's evidence of "a few instances of actual confusion among consumers," along with evidence of alleged infringer being listed before mark owner in Google results, was insufficient to establish irreparable harm *even though* the moving party held a registration and the presumption of irreparable harm was found to apply. *Id.* at 12. Here, Plaintiff's evidence of harm consists of two alleged instances of actual confusion (both of which constitute hearsay) and claims by Plaintiff's retained consultant that Defendant appears in Google searches targeting the Plaintiff's business, similar to those made in *Uyte*.  If in fact Plaintiff could show that infringement has occurred, any alleged injury and related remedy would be purely commercial and fully compensable, and therefore the Court should hold as it did in *Uyte*, and should find that irreparable harm has not been shown.

**IV.     The Balance of Equities Favors Defendant**

The balance of the equities also clearly weigh in favor of Defendant, given the enormous premature burden, cost, and harm injunctive relief would impose on Defendant. Again, the current, longstanding status quo is that Defendant has been using its mark in connection with the marketing and sale of products for at least two years, with sales and distribution spanning (per Plaintiff's own Complaint) across more than 2,200 Walmart stores across all 50 states, 450 Kroger locations, 273 Meijer locations, and 262 Harris Teeter locations. *See* Complaint ¶ 3.  On the basis of a few unverified claims of alleged customer confusion and Google search information provided by Plaintiff's retained consultant, Plaintiff now asks the Court to undo all of Defendant's years-long marketing and branding efforts at the preliminary injunction stage.  In other words, Plaintiff essentially asks that Defendant be ordered to recall and rebrand a product being sold at thousands of retail stores across the country based on limited and unverified evidence of claimed customer confusion.  These equities clearly do not balance in Plaintiff's favor, and such extraordinary relief would be improper and premature even if Plaintiff could demonstrate a likelihood of success on the merits (which it cannot do).

In fact, Plaintiff has not alleged any specific imminent harm that will occur if it is required to press forward under the current, long-standing status quo and wait until a trial on the merits to potentially obtain relief.  Plaintiff has, on the other hand, laid out ample evidence of the significant damage and costs that an injunction would impose on Defendant, based solely on Plaintiff's own motion.  If Plaintiff is required to wait until a trial to receive relief (as is the usual and ordinary course of litigation), the greatest potential harm it might (claim to) face would be the potential for a small segment of consumers to be confused (the reality and likelihood of which Plaintiff cannot

27

verify); on the other hand, if Plaintiff's request for extraordinary injunctive relief is granted, this case will be flipped on its head, and Defendant's brand will receive a virtual death blow before Plaintiff has presented even a shred of real evidence, and Defendant's brand and business would be permanently altered and damaged in ways which cannot be walked back.

Plaintiff's requested relief would essentially require Defendant to change its trade name, marketing, and branding on a nationwide level. *See GTE Corp. v. Williams,* 731 F.2d 676, 679 (10th Cir. 1984) ("If [defendant] must change his trade name now, it is probably unrealistic to expect he would change the name back…if he won on the merits. The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits."). This would be a monumental and virtually irreversible undertaking that would, for all intents and purposes, end this case before it has even begun – effectively, permanently depriving Defendant of the use of its mark based on a paucity of evidence. It might be different if this were a pre-use case, in which Plaintiff had sought such relief prior to Defendant investing in the use of its mark for well over a year (with Plaintiff's knowledge), but this is not such a case, and the injunction Plaintiff now seeks is one that would irreversibly reverse, rather than maintaining, the nationwide status quo.

Further, Defendant's requested injunction would cause financial harm to Defendant on a scale that vastly outweighs any potential harm to Plaintiff and Defendant cannot even begin to quantify. As alleged in Plaintiff's Motion, in January 2026 Defendant began distribution of its products through major retailers on a national scale. According to Plaintiff's motion, Defendant's goods now appear in 2,200 Walmart stores, 450 Kroger locations, 273 Meijer locations, and 262 Harris Teeter locations. If the injunction is granted, Defendant would be required to pull its goods

28

from the shelves from each of these locations, halting sales across the country, potentially exposing Defendant to even larger liability for breach of contract, and tarnishing Defendant's brand and commercial goodwill beyond measure. But Plaintiff does not stop there. Plaintiff also demands an injunction requiring Defendant to "affirmatively notify" all of its retailers of the injunction, meaning that Defendant would be required not only to take a loss for the entirety of its current inventory, but also to destroy its relationships with and reputation among the largest grocery retail companies in the United States. This presents an existential threat to Defendant's business.

In addressing the balancing of equities here, Plaintiff again cites to *Equitable,* to support the position that courts should afford little weight to "self-inflicted harms" when considering this factor. *Equitable* is again distinguishable: there, the Court relied heavily on Defendant's *intent* in reaching this finding, as it found that the defendant had tacitly acknowledged the potential confusion by seeking a coexistence agreement with the plaintiff and had then continued with its infringing activities after negotiations fell through. *Equitable Nat'l Life Ins. Co.*, 434 F.Supp3d at 1254-55. Further, the Plaintiff disregards that the "self-inflicted harms" principle relies on a strong showing by the moving party on the likelihood of success on the merits: otherwise, the third factor would be superfluous as it would essentially always come out for the moving party. As such, where a movant has failed to make a strong case for infringement, it is not entitled to consideration of whether the nonmovant cannot be said to have brought the harm upon itself. *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235 (D. Colo. 2009) (*citing Gen. Motors Corp. v. Urb. Gorilla, LLC,* 500 F.3d 1222 (10th Cir. 2007)).

Ultimately, because Plaintiff (1) has not made a strong showing on the merits, (2) is seeking injunctive relief that essentially amounts to the same relief it would receive if it were to succeed

at trial, including the costly and irreversible rebranding of Defendant's products, and (3) because the potential reputational and financial harm to Defendant arising from such an injunction would vastly outweigh any alleged harm to Plaintiff if the status quo were to be maintained until a trial on the merits, the balance of equities clearly weighs in favor of Defendant.

## V.       A Preliminary Injunction Would Be Contrary to the Public Interest

Finally, Plaintiff cannot establish that its requested injunctive relief would in any way benefit the public interest, and in fact, it would not.  With regard to this factor, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, (2008). The burden falls on the party seeking such relief to show that the requested injunction, if issued, is not adverse to the public interest. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003). Plaintiff has not met this burden.

Plaintiff's arguments on this factor essentially consist of the generic assertion that trademark infringement is against the public interest, which falls far short of satisfying its burden. Like Plaintiff's arguments on the "balance of equities" factor, the logic behind this assertion is circular and relies on the assumption of the Court having found that trademark infringement has occurred. That is far from the case here, and contrary to the position taken in Plaintiff's motion, courts in the Tenth Circuit have not universally found this factor in favor of movants in trademark cases. *See e.g. Packerware Corp. v. Corning Consumer Prods. Co.,* 895 F. Supp. 1438 (D. Kan. 1995); *Prime Media, Inc. v. Primedia, Inc.*, 33 F. Supp. 2d 932 (D. Kan. 1998); *Primedia Intertec Corp. v. Technology Marketing Corp.*, 35 F. Supp.2d 809, 824 (D. Kan. 1998). Thus, Plaintiff has

30

not shown (and cannot show) that the public interest weighs in favor of entering an onerous, inequitable, and status-quo-changing preliminary injunction.

**VI.     Plaintiff's Proposed Bond Amount Would Be Woefully Inadequate**

As noted above, according to Plaintiff's own Motion, Defendant's goods now appear in 2,200 Walmart stores, 450 Kroger locations, 273 Meijer locations, and 262 Harris Teeter locations. Thus, even if an injunction were warranted (which it is not), Plaintiff's proposed bond of $10,000 would provide Defendant with a mere $3.13 in security for *each store* in which it would have to pull its products from shelves were the injunction granted. For obvious reasons, such a bond would be woefully insufficient, and an appropriate bond would need to be calculated with that in mind.

**CONCLUSION**

For all the foregoing reasons, Plaintiff's Motion should be denied, and the parties should continue to proceed under the long-standing status quo during the pendency of this dispute.

Respectfully submitted,

/s/ Aaron T. Brogdon
Aaron T. Brogdon (009796)
FBT Gibbons LLP
10 W. Broad St., Ste 2300
Columbus, Ohio 43215
Phone: 614-559-7262
Email: abrogdon@fbtgibbons.com

*Attorneys for Defendant and Counterclaimant*
*Roxberry Naturals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed via ECF and thereby served automatically on all counsel of record this 10th day of April, 2026.

/s/ Aaron T. Brogdon
Aaron T. Brogdon (009796)

32