# EXHIBIT D
# to
# SUPPLEMENTAL DECLARATION OF THOMAS D. BRISCOE IN SUPPORT OF PLAINTIFF'S REPLY

---

## July 30, 2026 Letter from Defendant's Counsel Aaron T. Brogdon

FBT Gibbons

**Aaron T. Brogdon**
PARTNER
614.559.7262 (t)
614.464.1737 (f)
ABROGDON@FBTGIBBONS.COM

July 30, 2026

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO RULE 408**

**Via Electronic Mail**

Tom Briscoe
KNH LLP
50 W Broadway, Suite 900
Salt Lake City, Utah 84101
tbriscoe@knh.law

Re: *Roxberry Licensing, LLC v. Roxberry Naturals, Inc.*, Case No. 2:26-cv-00126-JNP-JCB — Settlement Posture and Recent Demands

Dear Tom:

I am writing to address Plaintiff's continued demands and the current settlement posture. As an initial matter, we feel it is important to set the record straight regarding the true legal effect of the parties' stipulation, the substantial weaknesses in Plaintiff's position on the merits and remedies, and the significant risks Plaintiff assumes by continuing to prosecute this matter and advance unrealistic settlement positions. Our client, Roxberry Naturals, Inc., entered into the stipulated injunction in good faith and for legitimate commercial reasons, based in no small part on the understanding that subsequent financial discovery would be geared toward pursuing a settlement that reflected the current financial reality – i.e., a settlement based on the revenues and profits (if any) Roxberry Naturals has realized to date.

Plaintiff's subsequent demands, however, have borne no relationship to the realistic value of this litigation and have largely been inconsistent with the terms of the parties' stipulation. Specifically, it is our understanding that your client has been

pressing for an agreement centered around rescinding the stipulation in favor of coexistence, accompanied by exorbitant payment demands that are wholly untethered to the facts and/or procedural posture. To our understanding, the message from your client has not simply been that our client can have more time to rebrand (i.e., the short extension you have referenced in your correspondence) but have attempted to steer our client away from rebranding to a preferred co-existence framework for settlement, stating that rebranding is unnecessary. Such representations are inconsistent with what the parties agreed to under the stipulation and have ultimately steered the discussions in an unproductive direction, with Plaintiff seemingly using such representations as a means to pursue a high-dollar settlement that was not contemplated at the time of the stipulation.

We therefore offer this letter and the analysis below as a good-faith effort to gauge your client's genuine interest in settlement, to realign expectations, and to reset the parties' settlement discussions before the parties expend further resources on litigation that will not warrant the cost or effort.

In short, our client has already agreed to provide Plaintiff the core relief trademark law is designed to provide – i.e., a rebrand that will ensure that there can be no possibility of any future confusion (to the extent any existed in the first place, which we deny) – yet your client continues to press for extraordinary monetary relief and advance settlement demands that seemingly reject the stipulated relief and bear no relationship to the record or to the remedies realistically available under the Lanham Act.

## I. <u>MERITS OF THE CASE</u>

### A. *Plaintiff Cannot Reach Damages or Attorney's Fees Without First Prevailing on the Trademark Infringement Claim*

Contrary to Plaintiff's apparent belief, the parties' stipulation did not render this a simple damages case, and while we had contemplated a potential settlement based on the revenue and profit numbers to date, Plaintiff's focus on the potential recovery of damages and attorneys' fees is premature. Simply put, the stipulated relief offered by our client already constitutes the lion's share of a settlement, and your client does not have the leverage it seems to think it does to press for additional monetary relief.

Even if the stipulation remains in place, before Plaintiff could recover anything,

it would have to first prevail on the underlying infringement claim by proving a protectable mark, our client's use of the mark, and—critically—a likelihood of confusion. See *Equitable National*.[1] On this record, the likelihood-of-confusion factors do not favor Plaintiff:

- **Validity and ownership are in dispute**. Plaintiff has not addressed our client's pending counterclaim to cancel Plaintiff's registration for fraud on the USPTO, which, if successful, invalidates Plaintiff's registration along with its evidentiary value and the presumptions of validity and ownership. 15 U.S.C. § 1115(b) (fraud is available as a challenge even to an incontestable registration).

- **The marks are dissimilar**. Compared in their entireties, as the law requires, Plaintiff's compound "ROXBERRY JUICE CO." design mark in a retro, cursive stylization differs markedly from our client's whimsical, kid-focused stylized "ROXBERRY."[2]

- **The parties' goods and trade channels differ**. Plaintiff sells fresh, made-in-store smoothies and juices at its smoothie bars, while our client sells canned carbonated soda alternatives on grocery-store shelves.

- **There is no probative evidence of actual confusion**. Plaintiff's few examples are *de minimis*, inadmissible hearsay, and/or not consumer confusion at all.

- **Our client had no intent to confuse**. It holds its own federal registration for its ROXBERRY design mark, and neither mere awareness of Plaintiff's mark nor continued use after a cease-and-desist letter evidences an intent to trade on Plaintiff's goodwill.

- **Plaintiff's mark is weak**. It is highly suggestive ("ROX" = "rocks"; "BERRY" = berries) and entitled to only a narrow scope of protection.

- **Purchaser care is neutral at best**. The parties target different consumers through different channels, so this factor does not advance Plaintiff's position.

---

[1] *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227 (D. Utah 2020).

[2] *See Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527 (10th Cir. 1994); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550 (10th Cir. 1998).

In short, Plaintiff cannot carry its burden on confusion. And even if it could, establishing liability would not automatically warrant an award of damages, profits, or fees—each a separate requirement with its own proof. Until Plaintiff clears the liability hurdle, its monetary demands are academic.

***B. Roxberry Naturals Has a Strong Affirmative Case for Cancellation of Plaintiff's Trademark Registration***

In assessing litigation risk, Plaintiff must also take into account our client's pending counterclaims and recognize that there are two independent grounds on which Plaintiff's Registration No. 5,495,492 may be subject to termination:

**1. Fraud upon the USPTO**

As our client has pleaded (Answer and Restated Counterclaim, Second Cause of Action [Dkt. 33]), there is a more than colorable argument that Reg. No. 5,495,492 arguably obtained via fraud and misrepresentation. During prosecution of the application, Plaintiff (through counsel, under penalty of perjury) represented to the USPTO in its October 11, 2017 Office Action Response that "the dominant portion of [Plaintiff's Registered Mark] is a highly stylized design consisting of the word 'Roxberry'" and that "an overarching and dominant part of [Plaintiff's mark] is the use of stylized fonts and design elements," and argued that use of the shared word "Roxberry" in marks containing additional elements "does not automatically mean that the public will be confused." Plaintiff reasserted those sworn statements in its January 2018 Response to Suspension Inquiry.

Those representations were material to issuance of the registration and are flatly contradicted by Plaintiff's present allegation (Amended Complaint ¶ 19) that "[t]he dominant and distinctive portion of [Plaintiff's] Registered Mark is the term ROXBERRY." Plaintiff cannot have it both ways. The very sworn statements that secured Plaintiff's registration defeat the theory of infringement Plaintiff now advances.

**2. Unlawful use**

A mark that is not used lawfully in commerce cannot support a valid federal registration, and a registrant's failure to comply with applicable franchising regulatory disclosure requirements—including federal and state franchise disclosure obligations—independently renders an underlying use unlawful and a registration subject to cancellation. If this litigation moves forward, please be advised that our

client intends to develop this ground through additional discovery into Plaintiff's franchising practices, expansion efforts, and disclosure compliance, etc.

## II. POTENTIAL LITIGATION OUTCOMES

Taking into account the foregoing merits discussion and the practical realities of litigation, we ask Plaintiff and its counsel to candidly assess both realistic endpoints of contesting the parties' claims and defenses to conclusion. No matter which party prevails, the economics of this case do not support Plaintiff's current demands.

***If Plaintiff Prevails on the Trademark Infringement Claims:***

- **Any Court Ordered Injunctive Relief Would Be Limited in Scope:** Even if it is able to establish a valid federal registration, a plaintiff must prove actual market penetration to obtain injunctive relief in specific geographic areas. As the Tenth Circuit recently confirmed in *Hetronic International, Inc. v. Hetronic Germany GmbH*, trademark rights are fundamentally geographical, and the owner of either a registered or unregistered trademark is not entitled to injunctive relief except in the area actually penetrated through use of the mark. *Hetronic International, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016 (2021) The court must determine the geographic scope of an injunction based on the mark's market penetration, which includes where the trademark owner has marketed or sold its product. *See Security USA Services, LLC v. Invariant Corp.*, Not Reported in Fed. Supp. (2023).

  The District of Utah applied this principle in *UFirst Federal Credit Union v. University First Federal Credit Union*, holding that even the owner of a federally registered mark who enjoys the presumption of nationwide priority is not entitled to injunctive relief except in the area actually penetrated through use of the mark. *UFirst Federal Credit Union v. University First Federal Credit Union*, Not Reported in Fed. Supp. (2023) The Court emphasized that establishing priority of use is not sufficient to bestow common law trademark rights, and the senior user must also establish sufficient market penetration in a specified geographic area, considering factors such as volume of sales, growth trends, number of purchasers relative to potential customers, and amount of advertising in the relevant area. *Id*.

  In the case of Plaintiff's franchised business, with smoothie locations in only

two states after eighteen years of operation, Tenth Circuit courts would likely limit an injunction to those two states and potentially areas where Plaintiff can demonstrate concrete expansion plans. In *Fotomat Corp. v. Cochran*, the District of Kansas granted injunctive relief where the plaintiff demonstrated that the disputed market was within its zone of reputation, zone of advertising, and zone of natural expansion. *Fotomat Corp. v. Cochran*, 437 F.Supp. 1231, 1245 (1977).

- **No Actual Damages:** Moreover, even if Plaintiff could establish liability, it has not demonstrated (and cannot demonstrate) any actual damages; it has identified no lost sales, lost customers, lost licensing opportunities, quantifiable goodwill damage, corrective-advertising expenditures, or any other measurable economic harm, particularly given the parties operate in different channels of trade.[3] Actual damages must be proven and cannot rest on speculation. 15 U.S.C. § 1117(a). Plaintiff has identified no such damages, and without a proven, non-speculative measure of actual loss there is nothing to treble under Section 1117(a).

- **Any Disgorgement Would Be *De Minimus*:** Any disgorgement of our client's profits begins with a very small revenue base (our client's sales are nominal, and it has yet to turn a profit) and would be reduced by allowable costs and deductions and remains subject to equitable principles. Realistically, any profits award would thus be *de minimus*. Disgorgement of profits is an equitable remedy governed by equitable principles. 15 U.S.C. § 1117(a); see *Hard Candy*.[4] We recognize that, where parties do not directly compete, a profits award may rest on an unjust-enrichment theory without proof of Plaintiff's actual loss. But that principle does not help Plaintiff here: our client's revenue base is nominal, any award would be reduced by allowable costs and deductions, and the result would remain subject to equitable adjustment—far removed from the figures Plaintiff has demanded. See *Vitamins Online, Inc.* .[5] Section 1117(a) authorizes trebling of actual damages but does *not* authorize

[3] Plaintiff's continued focus upon the value of foregone expansion opportunities into CPG and grocery channels are speculative and unsupported. Damages must be awarded based upon a proven, non-speculative measure of loss.

[4] *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343 (11th Cir. 2019).

[5] *Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1244 (10th Cir. 2023) (holding that courts retain equitable discretion to deny an award of profits when the equities weigh against such relief).

automatic trebling of profits; it permits only such adjustment of a profits award as is necessary to reach a just and compensatory result and expressly prohibits an award that operates as a penalty.

- **No Established Royalty Measure:** To the extent Plaintiff might seek to support and justify its settlement demands with a reasonable-royalty theory, it would have to identify a reliable method for calculating any such royalty; a bare rate untethered to a methodology will not survive summary judgment. See *JL Beverage Co.*[6] and any proposed royalty rate advanced in settlement is a negotiating construct, not a proven measure of damages. Plaintiff has identified no licensing history or methodology that would make it one.

- **Willfulness Is a Factor, Not a Threshold, and the Facts Cut Against Plaintiff:** With regard to willfulness, a defendant's mental state is not an absolute prerequisite to a profits award. See *Romag*.[7] While it can be a consideration, the equities here cut against Plaintiff: our client holds its own federal registration (No. 7,739,892), the parties historically coexisted on the federal register, this is not a counterfeiting or passing-off case, and—critically—the stipulation was expressly not an admission of wrongdoing or an acknowledgment of any of Plaintiff's claims. The merits defense set forth in Section II above further undercut any claim of willfulness.

- **Exceptional Case Standard for Attorney's Fees:** Your client's apparent belief that the specter of a fee award provides settlement leverage is also misplaced. Fee-shifting under the Lanham Act is available only in "exceptional cases"—those that stand out based on the substantive strength of a party's litigating position or the unreasonable manner in which the case was litigated—the Octane Fitness exceptional-case standard, which the Tenth Circuit has adopted for Lanham Act fee awards in *Derma Pen*.[8] Nothing here qualifies. Indeed, our client has agreed to rebrand and stipulated to injunctive relief; there is no ongoing infringement, no violation of court orders, no discovery

---

[6] *JL Beverage Co., LLC v. Beam, Inc.*, No. 211CV00417MMDCWH, 2017 WL 3666302, at *4 (D. Nev. Aug. 24, 2017) (dismissing reasonable-royalty damages claim where owner failed to identify a method of calculating a royalty).

[7] *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

[8] *Derma Pen, LLC v. 4EverYoung Ltd.*, 999 F.3d 1240 (10th Cir. 2021) (noting that "unusually vexatious and oppressive litigation practices" is one factor that can render a case "exceptional" to support an award of attorney fees when applying the Octane Fitness exceptional case standard).

abuse, and no bad-faith tactics.

- **Net Result for Plaintiff, if Successful:** Based on all of these considerations, *at best*, after expending substantial money, time, and resources, Plaintiff might stand to obtain an injunction—the very relief trademark law principally seeks and the relief our client has already voluntarily provided—and nothing more. Thus, as noted above, any continued efforts by your client to extract significant financial compensation in addition to the relief already provided by the stipulation is misguided and can only serve to undermine a reasonable settlement agreement between the parties.

***If Our Client Prevails on Its Defenses and Counterclaims:***

- **Plaintiff Receives Nothing:** On the flip side of all of the above considerations, if our client prevails in any continued litigation (which we believe is the more likely result), your client would receive ***no court ordered injunction*** (even a limited one), ***no damages***, ***no disgorgement***, and ***no attorney's fee award***.

- **Our Client May Pursue Attorney's Fees:** Moreover, our client also reserves the right to seek its own attorney's fees. We recognize that a fee award is not lightly granted: a plaintiff's suit must lack any reasonable foundation, and fees are denied where the likelihood-of-confusion question is objectively reasonable. Here, however, Plaintiff's decision to continue prosecuting this matter after the parties' stipulation effectively eliminated any prospective marketplace confusion—and in the face of Plaintiff's own contradictory sworn statements to the USPTO—may render continued prosecution objectively unreasonable, exposing Plaintiff to a fee award for costs incurred from that point forward. See *Derma Pen*; cf. *Alfwear*.[9] Our client has already asked for its fees and costs and on the foregoing basis will seek to recover them if Plaintiff chooses to unreasonably pursue additional relief to which it is not entitled.

- **Plaintiff Risks Losing Its Trademark Registration:** Obviously, the cancellation of Reg. No. 5,495,492 would have a materially negative impact on Plaintiff's business model, eliminating its ability to enjoin third parties from launching Roxberry-branded smoothie establishments outside Plaintiff's current, limited geographic footprint (Plaintiff has been unable to penetrate geographic

---

[9] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, 2023 WL 8232072 (10th Cir. 2023) (explaining that courts may consider factors such as frivolousness, motivation, and objective unreasonableness in determining whether a case is "exceptional" and warrants an award of fees).

markets outside Utah and Idaho and has shown no concrete expansion plans).

- **Forced Co-Existence:** Finally, should our client prevail following Plaintiff's rejection of the stipulated relief, Plaintiff could be left to accept continued co-existence with our client's Roxberry brand for packaged "healthy alternative" sodas sold at retail—having received nothing in return.

## III. IMPACT OF PLAINTIFF'S STIPULATION

### *A. Plaintiff Must Recognize the Commercial — Not Legal — Purpose and Nature of the Stipulation*

To be clear, our client entered the Stipulated Preliminary Injunction [Dkt. 45, filed June 3, 2026] solely on the basis of commercial considerations and with the understanding that it would form the substantial centerpiece of a potential settlement – not as a legal concession of any kind. The stipulation itself makes this unambiguously clear. It expressly provides:

> *"[T]he basis for this stipulation is primarily grounded in [Defendant's] commercial considerations, rather than the determination of any legal issues. By entering into this Stipulation, Defendant admits no liability or wrongdoing. . . . Any and all claims, defenses, and related arguments held and asserted by the Parties are expressly reserved."*

Thus, the decision to rebrand was a business accommodation aimed at providing your client bargained-for relief by eliminating any alleged source of future marketplace confusion and avoiding the expense of the preliminary-injunction hearing and ongoing litigation—not an admission that any of Plaintiff's claims have merit. Our client expressly reserved all rights, claims, and defenses, including its counterclaims for declaratory judgment and cancellation of Plaintiff's registration, and should Plaintiff elect to reject the stipulated relief (as it has advocated in recent settlement discussions), our client intends to litigate all such claims and defenses.

It must be further noted that the specific undertakings to which our client agreed were limited and defined: (1) notify retail distributors by July 1, 2026 that Roxberry-branded products are being discontinued; (2) cease all use of the ROXBERRY mark by August 15, 2026, subject to sell-through of existing inventory to be completed by October 1, 2026; and (3) disable and discontinue commercial use of the domain name "getroxberry.com" by July 1, 2026. Any sell-through sales are to be treated as ordinary sales for purposes of determining damages, if any. These are

the full obligations our client assumed—nothing more—and they leave no room for Plaintiff to pursue exorbitant monetary compensation as an accompanying settlement term. Simply put, your client cannot have its cake and eat it, too. Plaintiff already bargained for relief from any future confusion and/or damages (to the extent any would have existed in any event), and it cannot now seek to extract significant monetary compensation with those factors off the table.

***B. The Stipulation Is Not a Court Order and Is Subject to Rescission***

To the extent that Plaintiff still intends to abide by and enforce the stipulation, we also note that the stipulation is not a Rule 65 injunction or a consent decree enforceable by contempt. At best, it constitutes a contract between the parties, which would only remain enforceable to the extent that it is found to have been negotiated in good faith and Plaintiff has not already taken steps to waive or rescind it. The Court entered only a docket-text order finding the preliminary-injunction motion [Dkt. 16] moot in light of the parties' stipulation [Dkt. 46, June 3, 2026], and separately vacated the evidentiary hearing set for June 5, 2026 [Dkt. 48]. The Court did not enter a formal Rule 65 injunction and did not itself recite the restrained acts in reasonable detail as required by that Rule.

As the Tenth Circuit has held, "[s]tanding alone, a settlement agreement is nothing more than a contract," and "the imprimatur of an injunction is required to render it a consent decree enforceable through contempt."[10] Rule 65(d) precludes an injunction from describing restrained acts by reference to another document; the order itself must describe them in reasonable detail. See also *Macias*.[11] Because the Court here only acknowledged the parties' stipulation and declared the PI motion moot, the stipulation carries no contempt power and is properly characterized as a contract.

Because the stipulation is a contract, the path to relief runs through contract-law rescission principles—a lower bar than the consent-decree modification standard. Under Tenth Circuit law, a settlement agreement is enforceable absent a

---

[10] *Consumers Gas & Oil, Inc. v. Farmland Industries, Inc.*, 84 F.3d 367 (10th Cir. 1996) quoting

*D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir. 1993).

[11] *Macias v. New Mexico Dep't of Labor*, 300 F.R.D. 529 (D.N.M. 2014) (order merely acknowledging a settlement, without reciting the restrained acts, does not satisfy Rule 65(d) and carries no contempt power).

recognized consent-vitiating defect (fraud, duress, undue influence, or mistake).[12]

### *C. The Stipulated Relief (Rebranding) Already Constitutes More than Adequate Settlement Consideration*

As noted above, our client agreed to undertake a costly rebrand for commercial reasons and to avoid the expense of the preliminary-injunction hearing, with the reasonable expectation that the parties' ongoing negotiations would yield a proportionate resolution. Indeed, it was made clear in our subsequent communications that Plaintiff's continued press for our client's discovery responses related to sales, etc. of our client's products were, as you relayed, to inform the basis for any monetary contribution necessary for full settlement of this case, which would necessarily be tied to our client's actual profits (again, Plaintiff has shown no evidence of actual damages).

Plaintiff's subsequent demands, however, have borne no relationship to the litigation value of this dispute, which appears to have revealed an intended tactic of threatening ongoing litigation of the merits of this case as a means to strongarm our client into agreeing to provide Plaintiff with an equity interest in our client's company **and** millions of dollars, rather than proceeding with a rebrand. As we have previously made clear, however, such compensation is not available, nor is itnot warranted by the facts and current posture of this case. Because the commercial premise on which our client agreed to the stipulation has not materialized, our client has a colorable basis to seek rescission of the stipulation as a contract, on the grounds of a failure of the consideration's underlying commercial purpose. See *Bradley*; see also *Aquagen*.[13]

Even in the absence of rescission, Plaintiff would be limited to a breach of contract claim and, as you know, Plaintiff would not be entitled to double recovery given these facts and circumstances. See e.g., *Cache La Poudre Feeds, LLC v. Land O' Lakes, Inc.*, No. CIV.A. 04-CV-00329-W, 2008 WL 269451, at *3 (D. Colo. Jan. 29, 2008) ("Under Tenth Circuit case law, even though damages are claimed based on separate statutes or causes of action, when the claims arise out of the same set of

[12] *Agrawal v. Board of Regents of the University of Oklahoma*, 336 Fed. Appx. 765 (10th Cir. 2009).

[13] *Bradley v. Hybrid Sys., LLC*, No. 21-4047, 2023 WL 1978683, at *4 (10th Cir. Feb. 14, 2023) ("it is entirely permissible for a party to rescind a contract based on a failure of consideration"); *Aquagen Int'l, Inc. v. Calrae Tr.*, 972 P.2d 411, 414 (Utah 1998) ("failure of consideration is always a material breach.")

operative facts, as is the case here, there may only be one recovery.") Moreover, in an analogous case, the District of Colorado recognized that to prove breach of contract based on a contractual promise not to commit trademark infringement, the plaintiff must prove that the defendant's use was likely to confuse consumers, rendering the breach of contract claim *dependent upon* establishing trademark infringement elements *Health Grades, Inc. v. Robert Wood Johnson University Hosp.*, Inc., 634 F.Supp.2d 1247 (2009). We remain confident that Plaintiff will not prevail on the merits of its claim for trademark infringement which would obviate the possibility for recovery on a breach of contract claim. In the event our assessment of the merits of Plaintiff's claims is incorrect, something we do not concede, Plaintiff stands to gain no monetary award here.

* * *

Taking into account the foregoing analysis, our client remains willing to discuss a reasonable business resolution grounded in the facts, the applicable law, and the likely litigation outcomes. However, a multi-million-dollar demand bears no relationship to the litigation value of this dispute or to the remedies realistically available under the Lanham Act, and if this case is going to settle (as it should), your client will need to more clearly grasp the nature of the stipulation, the import and value of the agreed-upon rebrand, the additional proof (e.g., to establish liability) that would be required for Plaintiff to pursue and recover damages incurred to date, and the reality that (assuming liability could be established) any potential recovery would be *de minimus*, at best.

We also understand that Plaintiff separately values its ability to expand the ROXBERRY brand into CPG and grocery channels; if Plaintiff wishes to discuss a bounded commercial resolution on that basis, our client remains willing to engage, though any discussions must take into account the current reality. Plaintiff has already obtained the core relief trademark law is designed to provide—a promise to rebrand which is equal to cessation of the challenged use. Continued prosecution in pursuit of a (nonexistent) windfall serves no legitimate purpose, just as any continued settlement proposals involving seven-figure payments are a non-starter.

At this point, we therefore see two potential paths to a potential settlement:

1) Roxberry Naturals proceeds with the anticipated rebrand, which provides your client to no path to the recovery of damages, but which our client may be willing to supplement with a compromise amount of monetary compensation

reflective of the nominal profits obtained. In furtherance of this approach, Plaintiff must understand and recognize that the stipulated rebrand **is** the centerpiece of the settlement, and that it provides significant value in and of itself (including clearing the way for Plaintiff to enter into the CPG market) but does not provide Plaintiff any leverage to continue demanding significant monetary compensation.

2) Plaintiff opts to proceed with a co-existence arrangement as it has been proposing, in which case it must reconsider our client's generous offer for a 2% equity ownership share in connection with such co-existence. With Plaintiff not having entered the CPG market in over eighteen years of operation, a 2% equity ownership share would be a complete boon to Plaintiff, and such an agreement would also allows Plaintiff to retain its federal registration and expand nationwide (should it ever be able to do so) with its smoothie cafes. And as we have noted previously, there simply is not – as a purely practical matter – any room for our client to double up on such compensation by adding a seven-figure payment to the already generous equity offer. In short, our client's co-existence offer would be a 2% equity interest, period.

While we encourage Plaintiff to strongly consider these two options, our client reserves all rights in the litigation, including the right to seek rescission of the stipulation and litigate all of the foregoing legal issues on their merits should Plaintiff maintain a posture that makes resolution efforts unproductive. As such, if Plaintiff continues on its current course, and resolution along either of these two available paths has not been achieved by **August 14, 2026,** our client will be prepared to (1) litigate this dispute on its merits; (2) prosecute its counterclaims for declaratory relief and cancellation of Plaintiff's trademark registration; (3) pursue rescission and/or voiding of the stipulation to rebrand if/as necessary; and (4) pursue an award of its attorney's fees at the conclusion of this matter.

We trust that a candid assessment of the risks will lead Plaintiff to reconsider its current posture, and we are amenable to a meet-and-confer at your earliest convenience to discuss a path forward that reflects the actual equities of this dispute, in furtherance of pursuing an amicable resolution. We welcome any questions you may have and look forward to your response.

In the meantime, all rights, claims, defenses, and remedies available to our client are expressly reserved.

Sincerely,

FBT GIBBONS



Aaron T. Brogdon

cc: Samantha M. Quimby, Esq.
David P. Johnson, Esq.
Brittany Frandsen, Esq.
Chad Pehrson, Esq.
Stephen Mouritsen, Esq.